659 A.2d 541

**COMMONWEALTH of Pennsylvania, Appellee,**

**v.**

**Terrence McCRACKEN, Appellant.**

Supreme Court of Pennsylvania.

Argued Oct. 18, 1994.

Decided May 19, 1995.

542

John G. McDougall, for T. McCracken.

William H. Ryan, Jr., Dennis C. McAndrews, for Com.

Before NIX, C.J., and FLAHERTY, ZAPPALA, PAPADAKOS, CAPPY, CASTILLE and MONTEMURO, JJ.

## *OPINION*

NIX, Chief Justice.

Appellant, Terrence McCracken, appeals from the Order of the Superior Court which reversed the trial court's grant of a new trial based on after-discovered evidence. Because we find that the trial court did not err in granting Appellant's motion, we reverse the Order of the Superior Court and remand for a new trial.

On October 25, 1983, following a trial by jury, Appellant was found guilty of murder of the second degree,[1] two counts of robbery,[2] and one count of criminal conspiracy.[3] Appellant filed post-verdict motions seeking *inter alia* a new trial based on after-discovered evidence. The trial court granted Appellant's motion. The Superior Court reversed because it concluded that the new evidence offered by Appellant was not of such a nature that it would likely compel a different result. *Commonwealth v. McCracken,* 373 Pa.Super. 90, 540 A.2d 537 (1988). This Court affirmed by *per curiam* Order. *Commonwealth v. McCracken,* 524 Pa. 332, 572 A.2d 2 (1990).

In the present appeal, Appellant has again sought relief on the basis of after-discovered evidence. At issue in this case is the recantation of Commonwealth witness Michael Aldridge. The facts relevant to the instant appeal have been concisely set forth by the trial court:

> [A] man entered Kelly's Deli with a cover over his face and armed with a handgun. The man forced the owner, her daughter, and two customers into a walk-in refrigerator.

1. 18 Pa.C.S. § 2502(b).
2. 18 Pa.C.S. § 3701.
3. 18 Pa.C.S. § 903.

Thereafter, three customers came in and the man forced the three of them at gunpoint to the rear room of the Deli. A fourth customer, Charles Johnston, came in and was shot. He died as a result of the sho[oting]. The man, after taking money from the cash register, left the Deli. As he was leaving the Deli he was observed by two customers who were about to enter the Deli. None of the people in the Deli or about to enter the Deli were able to identify [Appellant] as the man who committed the robbery and shooting. All of them gave descriptions of the man and what he was wearing.

About an hour or so after the robbery and shooting Officer James Clifton saw [Appellant] standing in the street. The clothes that [Appellant] was wearing, except his hat, met the description of that given to police by the witnesses and [Appellant] also met the description. The hat [Appellant] was wearing when Officer Clifton saw him had a brim. All witnesses had indicated that the man who committed the crimes wore a dark knit hat.

[Appellant] agreed to the performance of a gunshot residue test which was performed. Also, found in [Appellant]'s home, among other things, was a dark knit cap.

At the trial the person who performed the gunshot residue test testified that in his opinion there was gunshot residue on [Appellant]'s left hand.

One witness, Michael Aldridge, was the only witness who identified [Appellant]. He testified that he saw [Appellant] enter and leave the Deli. Aldridge has known [Appellant] for years and had gone to school with him. When questioned shortly after the incident he said he did not recognize the person he saw enter and leave the store.

On March 21, 1983 (three days after the incident) Aldridge gave another statement to the police. In that statement he stated that [Appellant] was the person that he saw enter and leave the Deli.

On April 7, 1983 (about three weeks after the Kelly's Deli incident) John Robert Turcotte, Jr. and William V. Verdekal were arrested in the Borough of Clifton Heights, Delaware

County, Pennsylvania during the commission of a robbery. Turcotte had a handgun and tests on the handgun indicated that the bullet that killed Charles Johnston had been fired from the handgun that was in Turcotte's possession.

The Commonwealth attempted to connect [Appellant] with Turcotte and Verdekal by testimony that [Appellant] was a helper of Turcotte's in Verdekal's furniture delivery operation just before the Christmas holidays.

The Commonwealth charged Defendants Verdekal and Turcotte in the Kelly's Deli case. The cases were severed for trial. Turcotte would fit the description that was given by witnesses of the man who committed the robbery and shooting at Kelly's Deli.

[Appellant's] defense was alibi and that Turcotte committed the crime. The explanation of the residue found on his hand was that he had been helping a friend work on an automobile. Turcotte had been charged with other robberies and [Appellant] presented some witnesses in those cases to show modus operandi and to show that the handgun had been in Turcotte's possession for some time.

*Commonwealth v. McCracken,* Nos. 1584 March 1983; 2369 May 1983, slip op. at 3–6 (C.P. Delaware County Apr. 13, 1992). Following a trial by jury, Appellant was found guilty of murder of the second degree, two counts of robbery, and one count of criminal conspiracy. The trial court reasoned that because the victims' descriptions of the perpetrator fit both Turcotte and Appellant, and that Turcotte had the murder weapon in his possession, the jury must have placed considerable weight on Aldridge's identification testimony. *Id.* at 10. The history of Aldridge's involvement in this case has been aptly summarized by the trial court:

Aldridge when first questioned (March 18, 1983) by the police stated that he could not identify the person he saw enter and leave Kelly's Deli. When questioned the second time (on March 21, 1983) he said that he could identify the person he saw. He stated that the person was [Appellant]. In that statement he indicated that he was less than a block away from Kelly's Deli when he saw the perpetrator enter

and leave the Deli and that the person was [Appellant]. His testimony at the Preliminary Hearing conformed to the March 21, 1983 statement he gave to the police. On April 8, 1983 he gave another statement to the police. In that statement he indicated that he was walking toward McDade Boulevard approaching its intersection with Juliana Terrace when he saw [Appellant] walking on McDade Boulevard in the direction of Kelly's Deli. He stated that [Appellant] was in front of the Clam Tavern at the time. He stated that [Appellant] looked directly at him (Aldridge) and waved to him.

Aldridge in his trial testimony testified that he made the first statement to the detectives because he did not want to get involved. In his trial testimony he testified that in his second statement he indicated that he was closer to Kelly's Deli than the intersection of Juliana and McDade Boulevard so that his identification of [Appellant] *would be more believable.*

. . . .

In the Spring of 1990 Aldridge was serving time in a New Jersey Prison. He indicated he wanted to recant the testimony he had given in the McCracken case. Mr. McDougall [trial counsel] was contacted and on March 15, 1990, Mr. McDougall went to Northern State Prison, Newark, New Jersey, to talk with Aldridge. McDougall took a Court Stenographer with him. A statement (question and answer) was taken. In the statement Aldridge stated that he was not telling the truth at [Appellant]'s trial when he testified that he saw [Appellant] enter and leave Kelly's Deli. [Appellant], through McDougall, petitioned [the trial court] to grant a new trial on the basis of Aldridge's recantation. . . .

At the recantation hearing, inter alia, Aldridge testified that he was not telling the truth when he said [Appellant] was the person he saw entering and leaving Kelly's Deli. He testified that he did not know who it was he saw entering and leaving the Deli. He testified that no one pressured or induced him to make the recantation statement to Mr. McDougall or to appear in Court at the recantation

hearing. He testified that he was at the hearing because he wanted to clear his conscience and that he thinks [sic] [Appellant] should get a "fair day in Court". He testified that he was aware that he could face a perjury prosecution. He testified that detectives kept repeating [Appellant]'s name to him and suggesting [Appellant] was the perpetrator to the extent that he began to believe [that Appellant] was the perpetrator. He also testified that his female probation officer came to the detectives' office while he was there and that he was immediately taken off of probation. He admitted to being beaten, and admitted to threats to himself and to his family. He admitted to writing letters to New Jersey prison authorities to the effect that he feared for his safety in prison because he testified in [Appellant]'s case. In those letters he mentioned members of the Warlocks' gang being in prison and the beating by one Jerome Ambercelli who apparently was his cell mate. In the letters he was asking for protective custody and transfers to other prisons.

*Id.* at 9–12 (emphasis omitted).

The Commonwealth presented several witnesses at Aldridge's recantation hearing to support its contention that Aldridge had been threatened to recant. The trial court found all these witnesses to be credible; however, it observed that there was no evidence that Appellant had any part in the beatings of Aldridge or the threats to him and his family. *Id.* at 14.

The trial court also determined that the other evidence of threats and intimidation directed toward Aldridge had reasonable alternative explanations. It concluded that Aldridge's letters to New Jersey prison authorities were written not only out of fear, but also out of a desire to be transferred to a prison facility closer to Aldridge's home. *Id.* at 19. The court also found that Aldridge's beating in prison was solely the result of his reputation as a snitch and unrelated to his testimony in the McCracken case. *Id.* at 20–21. This finding was based on the considerable time lapse between the threats and beatings and the time that Aldridge recanted his identification. *Id.* at 20. The court was additionally persuaded by

the fact that Aldridge's recantation statement did not necessarily exclude Appellant as the perpetrator. *Id.* at 21. It reasoned that if Aldridge had been in fear for his safety to the extent that the Commonwealth claimed, he surely would have changed his statement to say that Appellant was *not* the person he saw enter and leave Kelly's Deli rather than say he was uncertain whether the person he saw was Appellant. *Id.* Although it indicated that it disbelieved much of Aldridge's testimony at the recantation hearing, the trial court concluded that Aldridge was telling the truth when he stated that he did not know the identity of the person that he saw enter and leave Kelly's Deli. *Id.* at 21, 28.

The trial court ordered a new trial because it was convinced that a different verdict would likely result from the recantation testimony, Mr. McDougall's testimony, and the evidence presented at Appellant's trial. *Id.* at 29–30. On appeal by the Commonwealth, the Superior Court held that the trial court committed an abuse of discretion in granting a new trial on the basis of Michael Aldridge's recantation. *Commonwealth v. McCracken,* No. 696 Philadelphia 1992, slip op. at 10 (Pa.Super. Dec. 31, 1992). It opined that Aldridge's recantation was motivated by freedom from further harassment and abuse rather than any desire to clear his conscience. *Id.* We conclude that the Superior Court erred in so holding and therefore reverse its Order which reversed the trial court's grant of a new trial.

■ Our consideration of the after-discovered evidence offered by Appellant is tempered by the fact that recantation is one of the least reliable forms of proof, particularly when it constitutes an admission of perjury. *Commonwealth v. Anderson,* 466 Pa. 339, 342, 353 A.2d 384, 386 (1976). In its opinion accompanying the Order granting a new trial, the trial court indicated its awareness of the inherent unreliability of Aldridge's recantation and observed that "Aldridge is no paragon of truth." *Commonwealth v. McCracken,* Nos. 1584 March 1983; 2369 May 1983, slip op. at 14 (C.P. Delaware County Apr. 13, 1992). Notwithstanding this fact, the court indicated that it had presided over every proceeding in this

case with the exception of the first bail hearing and preliminary hearing. *Id.* Having had the opportunity to listen to the testimony and observe the demeanor of the witnesses in this case, the court noted that "there are things which [it] can find which might come as a surprise to those who have not heard the actual testimony and seen the actual witnesses testify." *Id.* at 19.

This Court has recently reaffirmed the well-established standard for the consideration of after-discovered evidence.

> After-discovered evidence can be the basis for a new trial if it: 1) has been discovered after the trial and could not have been obtained at or prior to the conclusion of the trial by the exercise of reasonable diligence; 2) is not merely corroborative or cumulative; 3) will not be used solely to impeach the credibility of a witness; and 4) is of such nature and character that a different verdict will likely result if a new trial is granted.

*Commonwealth v. Wilson,* 538 Pa. 485, 511, 649 A.2d 435, 448 (1994) (citations omitted). In addition, "an appellate court may not interfere with the denial or granting of a new trial where the sole ground is the alleged recantation of state witnesses unless there has been a clear abuse of discretion." *Commonwealth v. Coleman,* 438 Pa. 373, 377, 264 A.2d 649, 651 (1970) (citations omitted).

We find that the recantation of Michael Aldridge fits squarely within the test for after-discovered evidence. It is clear that Aldridge's consistent statements to the police and testimony at Appellant's preliminary hearing and trial foreclosed the possibility that defense counsel could have persuaded Aldridge to change his statement concerning the identity of the perpetrator prior to the close of trial. Moreover, Aldridge's recantation is not merely cumulative or corroborative given the tenuous nature of the circumstantial evidence connecting Appellant to the crime and the inability of any other witness to make a positive identification of the perpetrator. In this case, where the only Commonwealth witness who identified the perpetrator has recanted his testimony, such evidence can not be considered cumulative or corroborative

because the defendant claimed that he did not commit the crime in question. This was the essence of Appellant's defense and the ultimate question in Appellant's trial. Thus, Aldridge's recantation is neither cumulative, corroborative, nor for impeachment purposes. Finally, as noted above, the limited evidence connecting Appellant to the crime makes Aldridge's recantation of such nature and character that a different verdict will likely result at a retrial.

Having found that Aldridge's recantation is after-discovered evidence, we need only look to the record to determine whether the trial court committed an abuse of discretion in granting a new trial.

> In reviewing the entire record to determine the propriety of a new trial, an appellate court must first determine whether the trial judge's reasons and factual basis can be supported. Unless there are facts and inferences of record that disclose a palpable abuse of discretion, the trial judge's reasons should prevail.

*Commonwealth v. Brown*, 538 Pa. 410, 436, 648 A.2d 1177, 1190 (1994) (quoting *Thompson v. City of Philadelphia*, 507 Pa. 592, 599–600, 493 A.2d 669, 673 (1985)). There is no dispute that Michael Aldridge was subjected to threats against himself and his family because he was a witness for the Commonwealth in this case. The record contains two specific incidents where Aldridge was confronted by Appellant's brother and verbally threatened in September 1983. (R.R. 29a, 31a). One month later, a written threat appeared on the school locker of Aldridge's sister. (R.R. 33a–35a). On May 4, 1984, Aldridge was assaulted by people who kicked and punched him and said, "This one's for Terry." (R.R. 35a). Some twelve days later, Appellant's brother confronted Aldridge and his father at their home which resulted in a physical altercation between Appellant's brother and Aldridge. (R.R. 36a–37a). All of these incidents were precipitated by Aldridge's cooperation with law enforcement authorities or his testimony against Appellant.

The next episode of harassment directed toward Aldridge occurred on November 6, 1989, over five years later, while

Aldridge was incarcerated in a New Jersey prison. Aldridge had received a letter from an organization known as the Centurions [4] in which it identified him as a witness for the Commonwealth in the McCracken case. (R.R. 38a–39a). Aldridge testified that he believed that his cellmate had read the letter and beaten him because Aldridge was a snitch and that this did not have anything to do with his participation in any specific case. (R.R. 39a–40a, 49a).

Aldridge's involvement in the McCracken case had received attention in the local Philadelphia newspapers as well as the television program *Inside Edition.* (R.R. 41a). It was this press coverage that served as the basis for Aldridge's letters to New Jersey prison authorities in which he sought a transfer or placement in protective custody. (R.R. 42a–44a). Aldridge stated that in addition to being motivated by fear of being known as a snitch, he wrote those letters in order to obtain a transfer from the facility where he was incarcerated because it was occupied by young, violent offenders. (R.R. 47a).

There is ample evidence in the record to support the trial court's findings regarding Michael Aldridge's testimony at his recantation hearing. Moreover, we must defer to credibility determinations made by the trial court which had the opportunity to observe the demeanor and hear the testimony of the witnesses. *Commonwealth v. Farquharson,* 467 Pa. 50, 59–60, 354 A.2d 545, 550 (1976). We therefore conclude that the trial court did not abuse its discretion in granting a new trial. The harassment directed toward Aldridge from Appellant's friends and family ceased sometime in 1984. If Aldridge were to be swayed by this intimidation, it would be likely that he would recant during the height of these threats and abuse. Instead, Aldridge recanted over five years later with no intervention from Appellant's relatives or associates.

The trial court discounted much of Aldridge's testimony at the recantation hearing. However, it was persuaded that

4. Appellant contends that the Centurions are a religious group that offers help to wrongfully convicted individuals. Brief for Appellant at 14.

Aldridge was not threatened to recant and that there were reasonable explanations for the events which took place following Aldridge's incarceration. We therefore conclude that Appellant is entitled to a new trial based on the after-discovered evidence presented in the form of the recantation of Michael Aldridge.

The Order of the Superior Court is reversed and the Order of the trial court which granted a new trial is reinstated.

PAPADAKOS, J., did not participate in the decision of this case.

CASTILLE, J., files a dissenting opinion in which CAPPY, J., joins.

MONTEMURO, J., is sitting by designation.

CASTILLE, Justice, dissenting.

Although the majority's opinion acknowledges that recantation testimony is one of the least reliable forms of proof, especially when it constitutes an admission of perjury, the majority nevertheless concludes that appellant is entitled to a new trial. Because I believe that the trial court abused its discretion in granting a new trial based on the recantation testimony of Michael Aldridge, in spite of overwhelming evidence that both he and his family were threatened for over a period years for his involvement in appellant's murder trial, thereby giving Aldridge the utmost incentive to recant his prior inculpatory testimony, I respectfully dissent.

This Court has held on repeated occasions that, "[r]ecanting testimony is exceedingly unreliable, and it is the duty of the [trial] court to deny a new trial where it is not satisfied that such testimony is true." *Commonwealth v. Anderson*, 466 Pa. 339, 342, 353 A.2d 384, 386 (1976), *quoting, Commonwealth v. Coleman*, 438 Pa. 373, 377, 264 A.2d 649, 651 (1970). "There is no less form of proof, especially when it involves an admission of perjury." *Id.*, 466 Pa. at 342, 353 A.2d at 385. Despite this well-established standard and the fact that the trial court discounted a substantial amount of Aldridge's testimony at the

recantation hearing, the lower court nevertheless was persuaded that Aldridge was not threatened to recant. Due to the record's overwhelming evidence to the contrary, the fact that the trial court seemed less than *convinced* that appellant's recantation testimony was completely reliable,[1] and because it is unlikely that his new testimony would produce a different result upon retrial, the trial court clearly committed an abuse of discretion in granting appellant's appeal for a new trial.

In finding that the trial court's order granting a new trial should be reinstated, the majority states:

> The harassment directed toward Aldridge from Appellant's friends and family ceased sometime in 1984. If Aldridge were to be swayed by this intimidation, it would be likely that he would recant during the height of these threats and abuse. Instead, Aldridge recanted over five years later with no intervention from Appellant's relatives or associates.

This conclusion, however, simply dismisses the effect that these threats had on Aldridge when they began to resurface and intensify in 1989 while he was incarcerated in a New Jersey county prison. In November of 1989, Aldridge's involvement as a witness in appellant's case was reported on the television news program *Inside Edition* and in the local newspapers. (R.R. at 40a). At the recantation hearing, Aldridge stated in regard to the television program, "You can't be a snitch in jail and survive." (R.R. at 40a). In another incident in November, Aldridge was beaten by his cellmate for being a "snitch," after his cellmate found a letter from a private investigator which connected Aldridge with the appellant's case. (R.R. at 38a–39a). As a result, Aldridge wrote two letters to prison officials in late November of 1989 asking to be placed in protective custody or relocated to another prison stating, ". . . I was warned that there are members of [appellant's] family and or friends of his here at Bordertown

---

1. To this regard, I note that the trial court's opinion states, "Clearly Aldridge is no paragon of truth." *Commonwealth v. McCracken*, Nos. 1584 March 1983; 2369 May 1983, slip op. at 14 (C.P. Delaware County Apr. 13, 1992).

and Midstate prison.[2] I was warned if I came here I would be hurt" and that "my life is in serious jeopardy." (R.R. at 40a–45a). These letters were written within less than a year of the recantation hearing which was held in August of 1990. Also, the trial judge noted that an employee of the Internal Affairs Department of Corrections for the State of New Jersey testified that he had investigated the claims and that Aldridge's fears appeared to be genuine. *Commonwealth v. McCracken*, Nos. 1584 March 1983; 2369 May 1983, slip op. at 12–13 (C.P. Delaware County Apr. 13, 1992). This evidence demonstrates a compelling motive behind the recantation testimony—fear—not a desire to tell the truth.[3]

Moreover, the final prong of the after-discovered evidence analysis requires that the evidence be of "such a nature and character" that it would most likely produce a different verdict upon retrial. *Commonwealth v. Wilson*, 538 Pa. 485, 649 A.2d 435, 448 (1994). However, despite identifying appellant, whom Aldridge had known throughout high school, as the person he saw entering and leaving Kelly's Deli at both the preliminary hearing and during trial, at no time during the recantation hearing did Aldridge identify any other individual as the perpetrator.[4] (R.R. at 19a, 22a). Aldridge did, however, maintain that the individual that he could not now identify was wearing the same clothing that appellant was wearing when he was apprehended within approximately one hour after the robbery and shooting. (R.R. at 22a). All eight of the witnesses who observed the sole perpetrator at the time of the

**2.** Aldridge was also aware that appellant's father was a member of the Warlocks, a motorcycle club with a notorious reputation for sociopathic conduct. In his second letter to prison officials Aldridge wrote, "The man I testified against was Terrance McCracken Jr. His father was a member of the Warlock Motorcycle Club in Delaware County. I was assaulted 3 times seriously in Collingdale as a direct result of this.". (R.R. at 43a).

**3.** Aldridge's sister was also threatened at school but the trial court found that the threats could have been "pranks". *McCracken, supra,* at 15.

**4.** At trial, Aldridge testified that during the span of at least five years, he saw appellant just about every day either at high school or in the neighborhood, thereby reducing the risk of a mistaken identity. (R.R. at 123–123, Notes of Testimony of Trial from October 18, 1983).

robbery and shooting gave substantially the same description as Aldridge concerning the man's clothing. *McCracken, supra,* at 4; (R.R. at 32–109, Notes of Testimony of Trial from October 18, 1983). This description included a red sweatshirt, dungarees and a dark knit cap. Although appellant was not wearing a dark knit cap at the time he was apprehended, which all of the witnesses had described the perpetrator as wearing, a dark knit cap was later found by the police in appellant's home. *McCracken, supra.* Furthermore, appellant agreed to submit to a gunshot residue test which tested positive on appellant's left hand. *Id.* Thus, because Aldridge's newest testimony simply fails to exculpate appellant, and the Commonwealth's case would include: (1) overwhelming circumstantial evidence of appellant's guilt which includes the eyewitness testimony of over eight persons, (2) Aldridge's prior inconsistent statements identifying appellant, (3) compelling evidence that his incentive to recant was to avoid imminent physical harm and (4) his admission of perjury; a new trial would most likely result in the same verdict. For the trial court to conclude now that Aldridge's latest account of the events is the true version is arbitrary, especially in light of the foregoing.

Accordingly, I would affirm the decision of the Superior Court reversing the trial court's order granting appellant a new trial.

Furthermore, in order for the trial court to have concluded that Aldridge's latest account of the events warranted a new trial, the trial court would have had to disregard its own findings that the Commonwealth witnesses at the recantation hearing were "very credible"; its own finding after the hearing that Aldridge was not a "paragon of truth"; and the jury's prior finding that Aldridge's pre-recantation testimony was credible. *McCracken, supra,* at 14. The trial court would also have to, in part, disregard the facts upon which appellant's conviction was affirmed by this Court subsequent to the first "after discovered evidence" hearing. In doing so, the trial court exceeded its role by relying on its own perception of the facts rather than on the established record. As the trial

court readily admits, "[i]f the recantation hearing was the only proceeding in this case heard by the writer of this Opinion, a decision would probably have been made from the Bench at the end of the hearing. The decision would have been to dismiss the Motion." *McCracken, supra.* Essentially, what the trial court is undertaking is a reweighing of all the evidence elicited in the various hearings in this case and is not affording the proper weight to the evidence at the present stage of the matter which it concedes is highly speculative. While a trial judge must necessarily look at newly discovered evidence or recantation against the backdrop of the entire testimony, the trial judge should view the evidence in the light most favorable to verdict winner. The trial court cannot substitute its perception of the facts for that of the jury in order to reach a conclusion that the highly unreliable recantation testimony offered here would result in a different verdict.

CAPPY, J., joins in this Dissenting Opinion.