J-A19029-21

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| | : | |
| JAMES MICHAEL BIDWELL | : | |
| | : | |
| Appellant | : | No. 102 EDA 2021 |

Appeal from the Judgment of Sentence Entered July 27, 2020
In the Court of Common Pleas of Monroe County Criminal Division at
No(s): CP-45-CR-0002259-2016

BEFORE:   DUBOW, J., MURRAY, J., and COLINS, J.[*]

MEMORANDUM BY MURRAY, J.:          **FILED SEPTEMBER 24, 2021**

James Michael Bidwell (Appellant) appeals from the judgment of

sentence imposed after a jury convicted him of first-degree murder, tampering

with evidence, and hindering apprehension or prosecution.  **See** 18 Pa.C.S.A.

§§ 2502(a), 4910, and 5105(a)(3).[1]  After careful consideration, we affirm.

The trial court recounted the following facts:

Kristen Wagner [(decedent or victim)] was found hanging from
[an electrical heating cord, inside] a refrigerated trailer in [a]
scrap yard [owned and operated by Appellant] on June 2, 2011,
at approximately 7:30 p.m.  [Appellant's] then-employee, Todd
Bachman [(Bachman)], called 911 from [Appellant's] scrap yard

---

[*] Retired Senior Judge assigned to the Superior Court.

[1] Although Appellant purports to appeal from the order denying his post-sentence motion, an appeal from an order denying a post-trial motion "is procedurally improper because a direct appeal in a criminal proceeding lies from the judgment of sentence." **Commonwealth v. W.H.M.**, 932 A.2d 155, 158 n.1 (Pa. Super. 2007).  We have corrected the caption accordingly.

at 7:39 p.m. and [decedent] was officially declared dead at 9:08 p.m. The body showed signs of lividity on the back, which could only have occurred if the body was lying on its back for a period of time after death. Furthermore, the body had transfer dust on the back and shoulders, as if it had been laid down on a dusty surface prior to being hung. [The Commonwealth presented expert testimony from Michael Lucas (Lucas), who opined that t]he ligature used to suspend the body from the top of the trailer was insufficient to have sustained a self-inflicted hanging, as the body would likely have fallen out of the loop prior to death. Large, fresh boot impressions that did not belong to the victim were found around the body, specifically on a box just under where the ligature was hanging from the top of the trailer—a box the victim would have had to have used to secure the ligature for a self-inflicted hanging because of her stature.

[Appellant] and the victim were seen together several hours prior to her death at the Cinder Inn, where the victim was in good spirits. The two appeared to be taking a lunch break from work at [Appellant's] Crowe Road scrap yard. After the victim's body was discovered, [Appellant] was contacted by [] Bachman and [Appellant] told him that [Appellant] was near Philadelphia. Phone records show [Appellant] was actually near Gouldsboro, Pennsylvania, which is within an hour from the crime scene, at the time he received the call from Bachman. Indeed, [Appellant] was seen at O'Donnell's Food and Spirits on the evening of June 2, 2011, and told a staff member that if anyone asked, he was not there that evening.

There was also evidence indicating that [Appellant] reported the victim's death to her father over the phone prior to anyone calling 911, [] indicating he had independent knowledge of her death. [Appellant] and the victim had a tumultuous relationship, including an incident where [Appellant] was seen grabbing the victim by the neck and threatening to kill her.

In the weeks prior to her death, [Appellant] was suspicious that the victim had been responsible for [Appellant's] arrest on drug charges in late 2010. Indeed, the victim had served as a confidential informant to the police regarding [Appellant's] drug activity and expressed fear that [Appellant] would kill her if he discovered her involvement. Shortly after her cooperation with police, the victim was found dead on [Appellant's] property. Forensic pathologist Dr. Wayne Ross testified [at Appellant's

- 2 -

February 2020 trial] that the victim's internal injuries and lack of external injuries led to the conclusion within a reasonable degree of scientific certainty that she was killed by compression to her neck in the form of a choke hold, as opposed to death by hanging.

Trial Court Opinion, 1/4/21, at 18-20 (record citations omitted).

The above facts notwithstanding, the original investigation in 2011 led law enforcement to conclude that the decedent committed suicide. Then, in June 2014, Richard Gerber (Richard) contacted police and stated that Appellant had admitted to killing the decedent. Based on this information, the police reopened the investigation, and in November 2016, the Commonwealth charged Appellant with the aforementioned crimes.

On July 12, 2017, the Commonwealth filed a pre-trial motion *in limine* seeking to introduce, *inter alia*, prior bad acts evidence that Appellant was involved in trafficking methamphetamines. Appellant filed an answer in opposition on August 15, 2017. Appellant also filed a motion *in limine* asking the trial court to exclude the proposed testimony as well as the expert report of Michael Lucas.

By opinion and order entered December 15, 2017, the trial court ruled, (a) evidence of Appellant's drug trafficking was relevant and admissible as possible motive and *res gestae* evidence; and (b) any evidence showing Appellant had been charged or convicted for drug-related offenses was

irrelevant and inadmissible.[2]  The court also denied Appellant's request to exclude Lucas's expert testimony.

At trial, the Commonwealth presented numerous witnesses, including Richard, who testified about Appellant's alleged confession.  **See** N.T., 2/10/20, at 167-68 (stating Appellant admitted he "strangled [decedent] in the office, and then he drug her body out to the refrigerator [trailer].  . . . And [Appellant] said that he strung her up there and made it look like a . . . suicide[.]").  The defense vigorously cross-examined Richard to show Richard's bias to present false testimony in exchange for preferential treatment from the Commonwealth in Richard's criminal cases, and as retribution against Appellant for false accusations Appellant has made against Richard.  **See id.** at 171-89.

Alyssa Benek (Benek), who Appellant employed at his scrap yard, also testified for the Commonwealth.  Benek stated that approximately one week after decedent's death, she met with Appellant and they smoked methamphetamine and engaged in sexual relations.  Benek testified that during the encounter, Appellant admitted he had murdered decedent.

---

[2] The Commonwealth filed an interlocutory appeal from this order; however, it did not challenge the rulings regarding Appellant's involvement in drug trafficking/associated charges.  **See Commonwealth v. Bidwell**, 195 A.3d 610 (Pa. Super. 2018) (affirming the trial court's exclusion of evidence related to Appellant's violent behavior towards women and the effect of his drug use).

The Commonwealth also called Carmen Mercadante (Mercadante), who testified he attended the same church as Appellant and had counseled Appellant and his wife when they were having marital difficulties. As we discuss below, Mercadante made improper remarks during his testimony concerning drug charges against Appellant, in violation of the motion *in limine* order. Appellant's counsel moved for a mistrial on this basis. The trial court denied a mistrial, but issued a cautionary instruction to the jury.

The Commonwealth also called Lucas, who the trial court qualified, over the objection of the defense, as an expert in "forensic knot analysis." Mr. Lucas opined, to a reasonable degree of scientific certainty, that decedent could not have committed suicide using the ligature that was found around her neck.

Likewise, Appellant called several witnesses, including Robert Riede. Mr. Riede testified that while he was incarcerated with Richard Gerber, Richard told him he planned to offer false testimony at Appellant's trial as retribution.

As noted, the jury convicted Appellant of first-degree murder and related charges. On July 27, 2020, the trial court sentenced Appellant to life in prison without the possibility of parole. Appellant filed a post-sentence motion two days later, seeking a new trial based on after-discovered evidence that Richard Gerber perjured himself and fabricated Appellant's confession.[3]

---

[3] Appellant "promptly" raised his claim of after-discovered evidence in compliance with Pa.R.Crim.P. 720(C).

Appellant further asserted new information showing the Commonwealth had given Richard Gerber preferential treatment in Mr. Gerber's criminal case, in exchange for his testimony at Appellant's trial; Appellant argued the Commonwealth never disclosed this evidence to the defense in violation of **Brady v. Maryland**, 373 U.S. 83, 87 (1963) ("[T]he suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution.").

The trial court held an evidentiary hearing on Appellant's post-sentence motion on August 11, 2020. Appellant presented testimony from Richard Gerber's brother, Gary Gerber, as well as a number of telephone calls between the Gerber brothers that were recorded by the prison where Gary Gerber was incarcerated. Appellant asserted these calls proved Richard Gerber had perjured himself and received favorable treatment from the Commonwealth in exchange for his testimony. The Commonwealth responded by presenting additional recorded calls between Gary Gerber and a number of individuals, including Richard Gerber. The trial court denied Appellant's post-sentence motion by order and an accompanying 45-page opinion entered January 4, 2021.

Appellant timely appealed, and both Appellant and the trial court have complied with Pa.R.A.P. 1925. Appellant presents this Court with the following five questions:

1. Is Appellant entitled to a new trial on the basis of after-discovered evidence that Richard Gerber, a key Commonwealth witness, committed perjury when he falsely testified at Appellant's trial that Appellant had confessed to the murder of Kristen Wagner?

2. Is Appellant entitled to a new trial on the basis of after-discovered evidence that the Commonwealth extended preferential treatment to [Richard] Gerber and dismissed criminal charges against him prior to eliciting his perjured testimony without disclosing this **Brady** evidence to the defense?

3. Did the trial court err in allowing the Commonwealth to introduce the testimony of an expert in forensic knot analysis who was permitted to testify that the "ligature material and manner of use was not consistent with a suicide" despite the fact that there was no knot on the ligature?

4. Did the trial court err in denying Appellant's request for a mistrial on the basis of prosecutorial misconduct where the Commonwealth elicited testimony that Appellant had previously been convicted of drug charges in violation of the court's pre-trial ruling on this issue?

5. Did the trial court err in preventing the defense from informing the jury that the prosecutor had intentionally misled the grand jury and a Commonwealth witness to believe that Appellant's DNA was found on the cable the decedent used to hang herself?

Appellant's Brief at 5.

Appellant first argues he is entitled to a new trial based on after-discovered evidence that Richard Gerber fabricated Appellant's confession. *See id.* at 18-28. We review a trial court's decision on whether to grant a new trial based on after-discovered evidence for an abuse of discretion. *Commonwealth v. Chamberlain*, 30 A.3d 381, 416 (Pa. 2011) ("Unless there has been a clear abuse of discretion, an appellate court will not disturb

the trial court's denial of an appellant's motion for a new trial based on after-discovered evidence").

To obtain relief, an appellant must demonstrate the evidence: "(1) could not have been obtained prior to trial by exercising reasonable diligence; (2) is not merely corroborative or cumulative; (3) will not be used solely to impeach a witness's credibility; and (4) would likely result in a different verdict." *Commonwealth v. Castro*, 93 A.3d 818, 821 n.7 (Pa. 2014) (citing *Commonwealth v. Pagan*, 950 A.2d 270, 292 (Pa. 2008)). "As this test is conjunctive, failure to establish one prong obviates the need to analyze the remaining ones." *Commonwealth v. Solano*, 129 A.3d 1156, 1180 (Pa. 2015) (citing *Pagan*, 950 A.2d at 292-93). Also, the proposed new evidence must be "producible and admissible." *Chamberlain*, 30 A.3d at 414.

Appellant contends "shortly after the trial, Appellant learned that Richard Gerber had informed his brother, Gary Gerber, prior to trial that he (Richard) had lied to the police about Appellant's confession." Appellant's Brief at 19; *see also id.* (referencing recorded prison telephone calls between Richard and Gary). Appellant asserts Gary's testimony at the post-sentence motion hearing established that Richard "had a pattern of falsely implicating others in crimes." *Id.* at 21-22. Appellant further argues:

> Since [decedent's] death had initially been ruled a suicide and since there was no DNA or other forensic evidence to connect Appellant to her death, [Richard's] testimony was instrumental in securing Appellant's conviction.

*Id.* at 19.

Instantly, the trial court has provided an exhaustive and well-reasoned analysis concluding that Appellant failed to meet **any** of the four abovementioned prongs enumerated in **Pagan**, **supra**. **See** Trial Court Opinion, 1/4/21, at 5-21; **but see also Solano**, **supra** (failure to meet even a single **Pagan** prong is fatal to a claim of after-discovered evidence). We agree with the trial court's reasoning as to all of the **Pagan** prongs. However, in concluding the trial court did not err in rejecting Appellant's after-discovered evidence claim, we emphasize and adopt the court's reasoning concerning the second and third **Pagan** prongs:

### Prong 2: Is the evidence merely corroborative or cumulative?

> To meet the second prong of the **Pagan** test, [Appellant] must show that the alleged after discovered evidence "is not merely corroborative or cumulative." **Pagan**, 950 A.2d at 292. In **Commonwealth v. Small**, the Pennsylvania Supreme Court further defined this prong of the after-discovered evidence test:
>
> > Though the after-discovered evidence test is well settled, this Court has never defined precisely what constitutes "merely corroborative or cumulative evidence." We begin by noting there is a subtle difference between evidence that is "corroborative" and evidence that is "cumulative." In the most general sense, corroborative evidence is evidence that differs from but strengthens or confirms what other evidence shows, while cumulative evidence is additional evidence that supports a fact established by the existing evidence…. [W]hether evidence is labeled "corroborative" or "cumulative" is not critical to the after-discovered evidence analysis; instead, what matters is whether the evidence **merely** corroborates or is cumulative of other evidence presented at trial. Thus, . . . the rule we ultimately announce for determining whether this prong of the after-discovered evidence test has been met applies

equally to evidence that is corroborative, cumulative, or both.

*Commonwealth v. Small*, 189 A.3d 961, 972-73 (Pa. 2018) (citations omitted, emphasis in original).

Based on the trial record, we find evidence that Richard fabricated [Appellant's] confession is merely corroborative of evidence presented at trial. As stated above, [Appellant] called Robert Riede to testify at trial. **Riede told the jury about Richard's alleged plot to make up [Appellant's] murder confession** and take same to law enforcement. *See* N.T., Jury Trial, 02/13/2020, pp. 77-84. Moreover, Riede's testimony was uncertain as to whether Richard had already carried out this plot. *Id.* at p. 80. Indeed, the timing of Riede and Richard's conversation while incarcerated is very close in time to Richard's interview with police in June of 2014. *Id.* at 85-86. Richard could very well have already gone to police with his allegedly false confession when he spoke to Riede, a point that the Commonwealth focused on during cross examination. *Id.* Additionally, Richard and his wife, Gwendolyn Gerber, testified extensively regarding the deteriorated relationship between Richard and [Appellant], as well as the **extreme bias Richard harbored for [Appellant]**. N.T., Trial, 02/10/2020, pp. 137-59; 164-66. The business turmoil between Richard and [Appellant] led up to Richard's interview with police in 2014. *Id.* at pp. 137-38; 172-86. Moreover, Richard's testimony highlighted his continued disdain for and bias toward [Appellant]. *See, e.g., id.* at pp. 175 ("I do hate him[, Appellant].").

Lastly, the final questions Richard was asked by defense counsel at trial, **in contrast with Riede's trial testimony**, would have shown the jury that **Richard is far from a trustworthy witness**:

Q. You ever told people that you despise [Appellant] and you would do anything to get even with him?

A. Never.

Q. **Ever told anybody that you intended to lie on him because he lied on you?**

A. Never.

- 10 -

Q. Never?

A. Never.

Q. Never?

A. Never.

Q. Have a nice day.

*Id.* at p. 189 (emphasis added).

Based on the foregoing, the evidence currently before us that Richard followed through with his plan to lie to police about [Appellant] "differs from but strengthens or confirms what other evidence shows" and is, thus, merely corroborative. Accordingly, [Appellant] has failed the second prong of the ***Pagan*** test.

As the jury was **already aware** of Richard's bias toward [Appellant] and the potential that he fabricated [Appellant's] confession, any testimony from Gary Gerber on this issue would have merely corroborated information of which the jury was already aware. Accordingly, [Appellant] fails the second prong of the ***Pagan*** test.

### Prong 3: Would the evidence be used solely to impeach the credibility of a witness?

To pass the third prong of the ***Pagan*** test, [Appellant] must show that the proposed evidence "will not be used solely to impeach the credibility of a witness." ***Pagan***, 950 A.2d at 292. [Appellant] correctly states that under this prong, impeachment material showing a key Commonwealth witness lied at trial "cannot be dismissed as 'merely impeaching' or as offered 'solely for the purpose of impeachment.'" [Appellant's Brief], p. 9 (citing ***Commonwealth v. McCracken***, 659 A.2d 541 (Pa. 1995); ***Commonwealth v. Perrin***, 108 A.3d 50 (Pa. Super. 2015). Unfortunately, in relying on this case law, [Appellant] assumes Richard Gerber was a key Commonwealth witness. A review of the trial evidence shows that **Richard was hardly a key witness for the Commonwealth**.

In the cases cited by [Appellant], the perjuring witnesses were "key" because they were the **only** witnesses to identify the respective defendants at trial. For example, in **McCracken**, the Pennsylvania Supreme Court remanded the case for a new trial where "the only witness who identified [a]ppellant" personally recanted his trial testimony seven years later. **Commonwealth v. McCracken**, 659 A.2d 541, 542-44 (Pa. 1995) (emphasis added). Similarly, in **Perrin**, the Pennsylvania Superior Court noted that the defendant's "convictions were based primarily upon the testimony of Lynnwood Perry," who placed the defendant at the scene of the crime but later told a fellow inmate that he had made up his trial testimony against Perrin. **Commonwealth v. Perrin**, 108 A.3d 50, 51 (Pa. Super. 2015). Notably, the outcome of **Perrin** was not a new trial, but rather a remand for an evidentiary hearing in the trial court to determine if Perrin had satisfied the after-discovered evidence test. **Id.** at 50.

In the present case, Richard Gerber did, indeed, serve as the catalyst for reopening the Commonwealth's death investigation into the suspicious death of [decedent], and the Commonwealth concedes this point…. However, **the Commonwealth warned the jury in its opening not to take Richard's statement to the police "at face value"** because "[y]ou have to investigate something like that." N.T., Trial, 02/05/2020, p. 29. Indeed, such a role, that being the catalyst to reopening a suspicious death investigation, does not make Richard a "key witness" at trial….

* * *

Perhaps most importantly . . ., **a witness other than Richard Gerber testified that [Appellant] confessed to killing [decedent]**. Specifically, Alyssa Benek stated that approximately one week after [decedent's] death, [Appellant] contacted her via Facebook messenger to meet up. **See** N.T., Trial, 02/11/2020, p. 144. The two spent the night drinking and using methamphetamine and, while at a bar, [Appellant] informed Benek that "[decedent] hung herself." **See id.** at p. 145. They spent the night together at [Appellant's] home and in the morning, as they were waking up, [Appellant] confessed, without preamble, that he had actually killed [decedent]. **See id.** at p. 147-49. Benek testified that she did not respond to this statement as she was scared of [Appellant]. **See id.** at p. 148-49. Thereafter, [Appellant] dropped Benek off at her vehicle and re-stated that

- 12 -

the victim had killed herself. *See id.* at p. 149. Furthermore, the jury was fully aware of Benek's prior inconsistent statements on this issue. *See id.* at pp. 151-60.

Accordingly, and especially in light of Benek's testimony, **any evidence that Richard Gerber lied about [Appellant's] confession would merely have been used to impeach his credibility**. As Richard was not the Commonwealth's only witness, or even a key witness, and the evidence absent his testimony would have been sufficient to convict [Appellant], the rules regarding impeachment evidence under *McCracken* and *Perrin* do not apply and [Appellant] has failed to prove the third prong of the *Pagan* test.

Trial Court Opinion, 1/4/21, at 14-17, 20 (emphasis added); *see also id.* at 18-20 (detailing incriminating evidence which the trial court found sufficient for the jury to convict Appellant of first-degree murder).

The trial court's analysis is supported by the record and the law, and upon review, we likewise conclude Appellant failed to prove his claim of after-discovered evidence. Thus, the court did not abuse its discretion in denying Appellant a new trial on this basis.

Appellant next contends the trial court improperly refused to grant him a new trial because the Commonwealth failed to disclose evidence in violation of *Brady*, *supra*. *See* Appellant's Brief at 29-31. Appellant asserts the evidence, consisting of recorded telephone calls between Richard and Gary, showed "Richard [] had been given preferential treatment with respect to outstanding criminal charges prior to providing his testimony at [A]ppellant's trial." *Id.* at 29. Appellant argues this evidence was highly exculpatory, stating:

> Since there was no physical or forensic evidence connecting Appellant to [decedent's] death, [Richard's] testimony implicating Appellant in the murder was the Commonwealth's proverbial "smoking gun" and the sole basis for Appellant's conviction.

*Id.* at 31.

To prove a *Brady* violation, the defendant must show: "(1) the prosecutor has suppressed evidence; (2) the evidence, whether exculpatory or impeaching, is helpful to the defendant; and (3) the suppression prejudiced the defendant." *Commonwealth v. Tharp*, 101 A.3d 736, 747 (Pa. 2014) (citation omitted). Our Supreme Court has stated, "the question is whether the favorable evidence could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict." *Commonwealth v. Lambert*, 884 A.2d 848, 854 (Pa. 2005) (citation and quotations omitted); *see also Commonwealth v. Benvenisti-Zarom*, 229 A.3d 14, 23 (Pa. Super. 2020) (to establish prejudice, a defendant must demonstrate "reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." (citation omitted)). "Conversely, the mere possibility that an item of undisclosed information might have helped the defense, or might have affected the outcome of the trial, does not establish materiality in the constitutional sense." *Commonwealth v. Dennis*, 17 A.3d 297, 308 (Pa. 2011) (citation, quotations and brackets omitted).

Here, the trial court explained:

[E]ven if we were to assume the existence of an agreement for leniency between Richard and law enforcement in exchange for Richard's testimony, [**Appellant**] **has failed to prove this evidence would have been material to him at trial**. Indeed, the standard set out by our courts for materiality in the ***Brady*** context is that the evidence at issue "could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict." ***Lambert***, 884 A.2d at 854. As discussed [above], **Richard's veracity at trial was certainly suspect, as his biases and motivation to lie was well explored by defense counsel on cross examination**. Accordingly, any additional information that would have suggested Richard was being less than truthful at trial, such as an agreement with law enforcement, would not "put the whole case in such a different light as to undermine the verdict."

First, **Richard discussed on direct and cross examination that he had many reasons to lie about** [**Appellant's**] **alleged confession**. ***See*** N.T., Trial, 02/10/2020, pp. 160-89. The purpose of disclosing agreements between the Commonwealth and a witness is to show the jury that a witness may be biased or not completely truthful in his testimony because he is looking forward to a positive outcome in his own criminal prosecution. ***See Commonwealth v. Solano***, 129 A.3d 1156, 1170-71 (Pa. 2015). Here, **both the Commonwealth and the defense highlighted** [] **substantial reasons for Richard Gerber to lie under oath**. Specifically, [Appellant] had created multiple legal problems for Richard and that Richard hated [Appellant] for that. ***See*** N.T., Trial, 02/10/2020, pp. 175-85. Second, as stated above, Richard was not the "key witness" [Appellant] claims he was. ***See supra*** []. The Pennsylvania Supreme Court has held that where "other identification witnesses offered testimony nearly identical to" the witness at issue, the defendant "fails to prove the result of trial would have differed had counsel been able to impeach [the witness] with evidence of a deal." ***Solano***, 129 A.3d at 1170-71. Here, the testimony of Alyssa Benek—that [Appellant] confessed to murdering [decedent]—is identical to that of Richard Gerber's. ***See*** N.T., Trial, 02/11/2020, p. 148-49. Accordingly, [Appellant's] purported inability to cross examine Richard about any alleged deals with the Commonwealth is of no moment as [Appellant] is likewise unable to prove said evidence would have been material at trial.

Trial Court Opinion, 1/4/21, at 23-24 (emphasis added).

Again, we agree with the trial court's reasoning, as it is amply supported by the record and law. No ***Brady*** violation occurred and thus the court did not err in refusing to grant Appellant a new trial based on this claim.

In his third issue, Appellant argues the trial court erred in permitting expert testimony from Michael Lucas, "despite the fact that [Mr. Lucas] is not a forensic pathologist and did not visit the crime scene." Appellant's Brief at 32; ***but see also id.*** at 35 (conceding "Lucas **was arguably qualified** to present an expert opinion on forensic knot analysis." (emphasis added)). Appellant asserts:

> [S]ince Mr. Lucas' proffered area of expertise was in forensic knot analysis, and since no knot was involved in [decedent's] hanging, Mr. Lucas' testimony was **irrelevant** to any issue at [A]ppellant's trial, and thus should have been deemed inadmissible.

***Id.*** at 32 (emphasis added); ***see also*** N.T., 2/10/20, at 19-20 (defense counsel objecting at trial).

In reviewing a challenge to the admission of expert testimony, we recognize:

> The admission of evidence is a matter vested within the sound discretion of the trial court, and such a decision shall be reversed only upon a showing that the trial court abused its discretion. The standard for qualification of an expert witness is a liberal one. The test to be applied when qualifying an expert witness is whether the witness has **any reasonable pretension to specialized knowledge on the subject under investigation**. If he does, he may testify and the weight to be given to such testimony is for the trier of fact to determine. A **witness does not need formal education on the subject**

- 16 -

**matter** of the testimony, and may be qualified to render an expert opinion based on training and experience.

Expert testimony is permitted as an aid to the jury when the subject matter is distinctly related to a science, skill, or occupation beyond the knowledge or experience of the average layman. Conversely, expert testimony is not admissible where the issue involves a matter of common knowledge.

*Commonwealth v. Smith*, 206 A.3d 551, 560 (Pa. Super. 2019) (emphasis added; citations and quotations omitted).

Further, expert testimony must be relevant:

Relevance is the threshold for admissibility of evidence. Evidence is relevant if it logically tends to establish a material fact in the case, tends to make a fact at issue more or less probable or supports a reasonable inference or presumption regarding a material fact. "All relevant evidence is admissible, except as otherwise provided by law." Pa.R.E. 402.

*Bidwell*, 195 A.3d at 616.

As referenced above, Appellant concedes Mr. Lucas was qualified to offer an expert opinion in forensic knot analysis.[4] Appellant's Brief at 35. Further, and contrary to Appellant's claim, the trial court correctly determined Lucas's testimony was relevant and admissible. In formulating his expert opinion, Lucas reviewed multiple forensic photos of the victim and the ligature, as well as the coroner's report, and performed his own testing utilizing a 6-foot

---

[4] The trial court explained that forensic knot analysis may, *inter alia*, "allow the examiner to distinguish between the self-tying characteristics found in suicides and autoerotic fatalities and the external tying characteristics observed in homicides." Trial Court Opinion, 12/15/17, at 40 (quoting Robert C. Chisnall, *Categorizing Innate Tying Behavior and Knot Sophistication Using Fundamental Principles*, J. Forensic Identification 447, 448 (2017)).

section of the cord from which decedent's body had hung. *See* N.T., 2/10/20, at 20-22, 25-29; *see also* Trial Court Opinion, 1/4/21, at 43-44 (detailing extent of Lucas's examination). To the extent Appellant states "no knot was involved in [decedent's] hanging," this assertion goes to the weight, not admissibility, of Lucas's testimony. Further, it was within Lucas's expertise to assess not just knots, but all types of ligatures, in formulating an opinion as to whether they were consistent with homicide or suicide. *See*, *e.g.*, N.T., 2/10/20, at 9 (describing area of expertise), and 20 (trial court stating: "I understood Mr. Lucas's expertise was in knots **and ligatures and all the things surrounding** that analysis." (emphasis added)).[5] Accordingly, the trial court did not abuse its discretion in overruling Appellant's objection to Lucas's testimony.

Appellant next argues the trial court erred in denying his motion for a mistrial based on prosecutorial misconduct, where the Commonwealth elicited prejudicial testimony from Mercadante regarding Appellant's conviction of drug crimes in violation of the motion *in limine* order. *See* Appellant's Brief at 36-40. Appellant states, "since the case against Appellant was highly circumstantial, it was unduly prejudicial to introduce testimony that Appellant

---

[5] The only law Appellant cites to support his claim, **Benvenisti-Zarom**, 229 A.3d 14, is unavailing because the circumstances of **Benvenisti-Zarom** bear no relation to those in this case.

had a record, thus permitting an inference that Appellant was predisposed to engage in criminal conduct." *Id.* at 40.

We are mindful that in assessing the denial of a mistrial:

> The trial court is in the best position to assess the effect of an allegedly prejudicial statement on the jury, and as such, the grant or denial of a mistrial will not be overturned absent an abuse of discretion. A mistrial may be granted only where the incident upon which the motion is based is of such a nature that its unavoidable effect is to deprive the defendant of a fair trial by preventing the jury from weighing and rendering a true verdict. Likewise, a mistrial is not necessary where cautionary instructions are adequate to overcome any possible prejudice.

*Commonwealth v. Johnson*, 107 A.3d 52, 53 (Pa. 2014) (citation omitted); *see also Commonwealth v. Judy*, 978 A.2d 1015, 1019 (Pa. Super. 2009) (observing that mistrial is an extreme remedy).

Additionally, "when dealing with a motion for mistrial due to a reference to past criminal behavior, the nature of the reference and whether the remark was intentionally elicited by the Commonwealth are considerations relevant to the determination of whether a mistrial is required." *Commonwealth v. Kerrigan*, 920 A.2d 190, 199 (Pa. Super. 2007) (citation omitted). Mere passing references to a defendant's prior criminal activity do not warrant reversal unless the record illustrates that prejudice resulted from the references. *Commonwealth v. Valerio*, 712 A.2d 301, 303 (Pa. Super. 1998).

Regarding claims of prosecutorial misconduct, our standard of review is limited to whether the trial court abused its discretion. *Commonwealth v.*

*Harris*, 884 A.2d 920, 927 (Pa. Super. 2005). Prosecutorial misconduct does not occur unless the prosecutor's improper comments had the unavoidable effect of prejudicing jurors by forming in their minds fixed bias and hostility toward the defendant. *Commonwealth v. Natividad*, 938 A.2d 310, 325 (Pa. 2007). "In our review of whether the prosecutor's comments were improper, we must look at the context in which the prosecutor made the statements." *Commonwealth v. Rice*, 795 A.2d 340, 357 (Pa. 2002).

The following exchange occurred between the Commonwealth and Mercadante:

> Q. Okay. Now you said much later there was focus [*sic*] of an individual, somebody that [Appellant] was accused of being unfaithful with; is that fair to say?
>
> A. Yes.
>
> Q. Do you recall who that might have been?
>
> A. That was [decedent].
>
> Q. Okay, did you know [decedent]? . . .
>
> A. No, I did not know anything of [decedent] until — it might have been **after** [**Appellant's**] **drug arrest**. Somewhere — it was a few years later.
>
> * * *
>
> Q. Was there a change over time from [Appellant] concerning whether he was unfaithful with [decedent]? . . .
>
> A. So, it wasn't until, I believe, **his drug arrest** that I remember — as I have always done with [Appellant], I remember saying to him about you got to tell the truth, you know. ...
>
> Q. Did [Appellant] say why he cheated on her that one time?

- 20 -

A. Well, at the time he was like "I was weak, my wife was away. . . ."

Q. Okay.

* * *

A. And then, again, [Appellant] was like "she'll divorce me, I can never tell her. I repented to God, that's good enough." I'm like, "No, it's not." . . . It was sometime later that [Appellant] eventually told [his ex-wife]. I want to say it had something to do with either **his drug trial or the day of sentencing** or something in that time frame.

* * *

Q. And this was the time when [Appellant] only admitted to like a one-night kind of stand?

A. Correct.

Q. Okay, did that change?

A. Yes, sometime later . . . this was an ongoing thing while [Appellant's ex-wife] was away, when she was out living in New Jersey or wherever she was.

Q. And how did that change come about?

A. Well, exact timing I don't know. I'm sure it had to do around the time of **his drug trial or his conviction**. . . .

N.T., 2/10/20, at 77-80 (emphasis added).

After the above testimony, defense counsel moved for a mistrial. The trial court denied the request, explaining:

Appellant presents no evidence, beyond bald assertion, that the jury was prejudiced in any way by [Mercadante's] challenged testimony. As such, after thorough review, we find the testimony at issue was not "of such a nature or substance or delivered in such a manner that it may reasonably be said to have deprived

- 21 -

the [defendant] of a fair and impartial trial." ***Commonwealth v. Whitman***, 380 A.2d 1284, 1289 (Pa. Super. 1977), *quoting* ***Commonwealth v. Phillips***, 132 A.2d 733, 736 (Pa. Super. 1957).

Notably, [Mercadante's] testimony at issue was disclosed inadvertently. **The Commonwealth did not purposefully introduce the inadmissible evidence**, nor did it lead or encourage the witness to do same. The witness merely used Appellant's drug charge as a frame of reference to orient his testimony. **Given the jury's exposure at trial to *admissible* testimony regarding Appellant's drug trafficking activities, Mr. Mercadante's inadvertent reference to drug charges was not so prejudicial as to have deprived Appellant of a fair trial**.

In addition, **the testimony at issue was not an integral component of the Commonwealth's case, nor was Mr. Mercadante a key witness to the prosecution**. Mr. Mercadante was Appellant's friend and a fellow parishioner at Calvary Chapel. His testimony established that Appellant engaged in an on-going extra-marital affair with the victim and that Appellant stated on multiple occasions that the victim committed suicide. Further, Mr. Mercadante was presented as a lay witness – not an expert or a member of law enforcement. As such, the nature and substance of the testimony was not such that the inadvertent disclosure of inadmissible evidence prejudiced the jury.

Moreover, the court took **immediate** remedial steps to prevent further disclosure of inadmissible evidence. After [defense counsel] moved for a mistrial, the court instructed the prosecutor to speak with [Mercadante] and prevent any further reference to inadmissible evidence. To facilitate this, the court adjourned the jury and had the witness step down to speak with the prosecutor. Before the jury adjourned, **the court delivered an unequivocal curative instruction regarding the inadmissible evidence**. [*See* N.T., 2/10/20, at 82-83 ("Ladies and gentlemen, I just want to give you an instruction to disregard [Mercadante's] testimony regarding any potential conviction or sentencing on some other charge for [Appellant]. It is irrelevant. It cannot be used in this case as evidence or proof of anything at all, and you must disregard it.")].

As such, even assuming [Mercadante's] testimony prejudiced Appellant, the court's prompt and thorough curative instruction to the jury removed any potential prejudice. ***Commonwealth v. McClain***, 472 A.2d 630, 634 (Pa. Super. 1984)[; ***see also Johnson***, ***supra*** (a mistrial is not necessary where cautionary instructions are adequate to overcome any possible prejudice)]. Our curative instruction was clear and unequivocal – the inadmissible evidence could not be used as proof of anything and must be disregarded. Importantly, "juries are presumed to follow the instructions of a trial court to disregard inadmissible evidence." ***Commonwealth v. Manley***, 985 A.2d 256, 268 (Pa. Super. 2009). Thus, even assuming prejudicial effect, our prompt and thorough curative instruction removed any potential bias. Moreover, our remedial instructions to the prosecutor and witness prevented further disclosure of inadmissible evidence.

Finally, . . . the evidence submitted at trial was sufficient for a jury to find beyond a reasonable doubt that Appellant committed first degree murder. [] Mercadante was not an integral component of the Commonwealth's case, and his inadvertent testimony did not hinder the objective weighing of evidence or impede the rendering of a true verdict. As such, Appellant was not deprived of a fair and impartial trial.

Trial Court Opinion, 2/23/21, at 8-10 (emphasis added; some citations omitted).

We agree with the trial court's reasoning. The record indicates Mercadante's remarks were an unexpected response to proper questioning and not intentionally elicited. ***See***, ***e.g.***, ***Commonwealth v. Baez***, 720 A.2d 711, 730 (Pa. 1998) (rejecting claim of prosecutorial misconduct where there was no evidence of intent by the prosecution); ***Commonwealth v. Rayner***, 153 A.3d 1049, 1059 (Pa. Super. 2016) (no prosecutorial misconduct occurred when "[r]eading the prosecutor's comments in context"). The trial court did not abuse its discretion in denying Appellant the extreme remedy of a mistrial.

In his fifth and final issue, Appellant claims the trial court abused its discretion by precluding defense counsel from informing the jury, through cross-examination, that Mercadante's trial testimony "was likely biased based on his false belief that physical evidence found at the crime scene implicated [A]ppellant in the death of [decedent]." Appellant's Brief at 43. Appellant explains:

> the prosecutor improperly suggested to Mr. Mercadante, during his questioning before the grand jury, that Appellant's DNA was found on the ligature [decedent] used to commit suicide.[3] This misrepresentation undoubtedly convinced Mr. Mercadante that Appellant was guilty of the murder, and thus informed his opinions on Appellant's behaviors and statements in the days and months following [decedent's] death.
>
> > [3] The prosecutor's conduct was improper because Appellant's DNA was not, in fact, recovered from the ligature. *See Commonwealth v. Larkins*, 489 A.2d 837, 840 (Pa. Super. 1985) (there is little question that it is improper for the prosecutor to ask questions which imply the existence of a factual predicate and which attempt to create impressions of guilt through innuendo).

*Id.* at 43-44 (footnote in original).

It is well-settled that an appellate court reviews rulings on the scope and limits of cross-examination for an abuse of discretion. *Commonwealth v. Gross*, 241 A.3d 413, 420 (Pa. Super. 2020). "When a trial court determines the scope of cross-examination, it may consider whether the matter is collateral, the cross-examination would be likely to confuse or mislead the jury, and the cross-examination would waste time." *Commonwealth v. Largaespada*, 184 A.3d 1002, 1009 (Pa. Super.

2018). "As a general rule, evidence of interest or bias on the part of a witness is admissible and constitutes a proper subject for cross-examination." ***Commonwealth v. Birch***, 616 A.2d 977, 978 (Pa. 1992).

Here, the trial court addressed the relevant exchange and detailed why it limited cross-examination:

> [T]he record supports finding the scope of direct examination was limited to: (1) Mr. Mercadante's recollection of conversations with the Appellant regarding his affair with [decedent]; and (2) recollection of conversations with the Appellant regarding reasons [decedent] may have killed herself. **At no point during direct examination did [the prosecutor] question the witness regarding his grand jury testimony, nor did he raise any inferences to implicate same**. As such, [defense counsel's] questions on cross-examination related to Mr. Mercadante's grand jury testimony were **beyond the scope of direct examination**, did not serve to "refute inferences raised during direct testimony," and did not "discredit [the] witness through questions about acts or omissions inconsistent with his testimony." ***Commonwealth v. Ogrod***, 576 Pa. 412, 839 A.2d 294, 322 (2003). As a result, the decision to sustain the Commonwealth's objection and prevent [defense counsel] from inferring [that the prosecutor] misled the grand jury was soundly within the [trial] court's discretion.

> Notably, [**defense counsel**] **was able to question** [**Mercadante**] **regarding his grand jury testimony and asked a thorough and probing follow-up regarding whether the witness ever heard DNA was uncovered on the cord**. In sustaining the Commonwealth's objection, the court only prevented [defense counsel] from further inferring that [the prosecutor] deliberately misled the grand jury. **The court did not prevent the witness from acknowledging that he never heard DNA was uncovered on the cord**. As such, the jury was not deprived of relevant testimony and was free to weigh [the prosecutor's] grand jury questions against other evidence heard in the case.

> We further note that, after the initial sidebar, [defense counsel] agreed to rephrase the question – he did not move for a

mistrial or otherwise contest the court's ruling. Following this, [**defense counsel**] **proceeded to ask the witness the exact question he now asserts the court prevented him from asking**, mainly, "While you were there that day in front of the grand jury, before you left, did [the prosecutor] say while you were under oath or say in the presence of the grand jury, hey, listen, I just made that up, there was no DNA of [Appellant's]?" N.T., 2/10/20, p. 96.

After the Commonwealth objected a second time, the court did not issue a curative instruction, and no further remedial action was taken. As such, we disagree with Appellant's contention that the court prevented the defense from informing the jury about the alleged misleading of the grand jury. In fact, the jury did hear the allegation and no curative instruction was issued. **Although** [**defense counsel**] **was prevented from pursuing this line of questioning, the notion that the jury was entirely prevented from hearing the allegation is misplaced**.

Notwithstanding the foregoing, even if we assume this court committed error in preventing [defense counsel's] grand jury line of questioning, any such error, in light of the remaining evidence against Appellant as outlined in our January 4, 2021 [post-sentence] opinion, was harmless. ***See Commonwealth v. Allshouse***, 36 A.3d 163, 182 (Pa. 2012) [(discussing harmless error doctrine)].

Trial Court Opinion, 2/23/21, at 14-16 (emphasis added).

Upon review, we discern no abuse of the trial court's discretion in limiting cross-examination.

Accordingly, and for the reasons discussed above, we find no merit to Appellant's claims of error.

Judgment of sentence affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: <u>9/24/2021</u>