J-S02014-24

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| ARNETT F. CARTER | : | |
| | : | |
| Appellant | : | No. 819 EDA 2023 |

Appeal from the PCRA Order Entered February 3, 2023
In the Court of Common Pleas of Philadelphia County Criminal Division at
No(s): CP-51-CR-1019501-1987

BEFORE: LAZARUS, P.J., MURRAY, J., and STEVENS, P.J.E.[*]

MEMORANDUM BY LAZARUS, P.J.: **FILED APRIL 24, 2025**

Arnett F. Carter appeals from the order, entered in the Court of Common Pleas of Philadelphia County, denying, without a hearing, his petition filed pursuant to the Post Conviction Relief Act (PCRA), 42 Pa.C.S.A. §§ 9541-9546. After careful review, we are constrained to reverse and remand for a new trial.

On February 3, 1989, a jury convicted Carter of first-degree murder[1] and possession of an instrument of crime (PIC).[2] On May 31, 1990, Carter

_____

[*] Former Justice specially assigned to the Superior Court.

[1] 18 Pa.C.S.A. § 2502.

[2] *Id.* at § 907.

was sentenced to life in prison without the possibility of parole.[3]  Our Court

provided the relevant history of the matter as follows:

> On September 11, 1987, [Carter], Derrick Williams[,] and Kim Riddick were passengers in a Ford Bronco driven by Mark Casey. William Crum was standing on the 200 block of East Haines Street, talking to decedent[,] Michael Thomas, when the [car] driven by Casey pulled up.  Casey knew Crum from the neighborhood and when he saw him on the sidewalk, he pulled over and three of the men[—]Riddick, Casey and [Carter—]got out and began assaulting Crum.  When Thomas attempted to come to Crum's aid, [Carter] retrieved a gun from the truck, pulled Thomas aside[,] and fired a single bullet at close range into the left side of Thomas' head, killing him.  Crum identified all three men as his assailants from three separate photo arrays, and gave a statement to police asserting that he saw [Carter] shoot Thomas, leading to [Carter's] arrest.
>
> [On September 21, 1987, Riddick gave a statement to the police that did not incriminate anyone in the shooting, but explained that he arrived at the scene in the Bronco with Casey and Carter to "meet [a friend named Boozer] because some[]body was harassing him and beating him up."  Riddick stated that he and Carter got out of the Bronco to talk to Boozer and then "guys started arguing with [Casey] about [Casey's] brother."  Kim Riddick Statement, 9/21/87, at 2.]
>
> At the preliminary hearing, [held on October 7, 1987,] Crum testified consistently that he saw [Carter] shoot Thomas[.] [H]owever, [at Carter's first trial held in December 1988, Crum] recanted both his [post-incident] statement [made to Detective Paul Worrell] and his preliminary hearing testimony[,] . . . claiming he was coerced by police into making the initial statement[4] and threatened by members of [Thomas'] family if he

---

[3] Carter was also sentenced to a term of 12-60 months' incarceration on the PIC charge.  All remaining charges were *nolle prossed*.

[4] Crum specifically testified that Detective Worrell beat him, that he was "confused" at the preliminary hearing, and that he thought he was supposed to testify consistently with his statement.  **See** Commonwealth's Motion to Dismiss, 11/2/21, at 4.

failed to identify [Carter] as the killer.  [Specifically, Crum testified at the first trial that:

> When this first happened, the first incident happened, I went down to the family's house, you know.  See, I've been beaten all night.  Once I got home, the police homicide [Detective] Worrell [] called my mother's house. Okay? He told me that he wanted to ask me questions**, but I told him I didn't see nothing** [sic], I was on the ground, and I was fighting.  Okay?  But a certain guy, Ski[, Kim Riddick], the small one, short one, okay - - once I got down there, [Worrell] put me . . . in a room and beat me.  I got knocked out.  When I woke up, this is what I had to do in order to go home.  I couldn't make a phone call to nobody [sic].

> \*     \*     \*

> Whole thing was made up by them, [Detective] Worrell and his partner.

> \*     \*     \*

> At the time [of the preliminary hearing] I was a little confused, because I know the person's—the guy's family pretty well, and I knew the other guys pretty well.  This is where  I got mixed up.  Okay?  It was out of fear from the beatings and threats, things, all that.  I just couldn't—I hadn't made up my mind until the incarceration, 14 months I've been sitting in jail.

> \*     \*     \*

> [] They caught me at a weak point.  Okay?

> \*     \*     \*

> Since that day I've been a little confused, and I was sorry about what happened.  If that bullet was meant for me, I'm glad I'm still here.  I'm not going to feel sorry for nobody but myself at this time.  Okay?  []

> \*     \*     \*

> You threatened—you did everything you had to do.  [Detective] Worrell and his buddy should be here; behind the fact they beat me where I had to sign that, because I couldn't go on.

> \*     \*     \*

The way you[, D.A. Campolongo,] and the homicide detectives deal with things is wrong. Y'all need to be the one[s] punished.

\* \* \*

Answer was no [**I did not see somebody get shot**], [o]kay, be[sides]the fact that after the fight broke out, we was both—all three was on the pavement. Punches started, we got in the street. Just that—the whole time this is supposed to went [sic] on, and **each time he asked did I see a shot, did I hear a shot, I told him no**. Okay? This is when he puts in his parts, you know what I'm saying[?]

\* \* \*

I want to tell the truth, right.

\* \* \*

I'm the one that got beaten up. The cops beats me up. He threatened me. What I'm supposed to do? I'm in court now. I'm mad.

\* \* \*

I don't want to answer no more questions, because he forced me and the DA forced me and homicide forced me to do this.[5]

_____

[5] **See** N.T. Jury First Trial, 12/12/88, at 7-8. The District Attorney continued to question Crum at Carter's first trial, asking him the following:

| | |
|---|---|
| D.A.: | By the way, was anyone beating you up in the courtroom [during the preliminary hearing]? |
| Crum: | No. |
| D.A.: | The judge beat you up? |
| Crum: | No. |
| D.A.: | Did the DA beat you up? |
| Crum: | No. |

(Footnote Continued Next Page)

\*     \*     \*

[The trial judge permitted the Commonwealth to put Detective Worrell on the stand to explain an exchange that the detective had with Crum right before trial so that the jury could assess] "whether or not [] Crum was lying with regard to his recantation." N.T. Jury Trial, 12/13/88, at 48. [Specifically, Detective Worrell testified at the first trial that right before trial, Crum told him that] "I not gonna [sic] testify, I'm just not testifying in this case . . . I know you can't make me do it." *Id.* at 40. [Detective Worrell then testified that Crum told him he would not testify to the parts of his statement that Detective Worrell ]"made [him] sign" [and that Detective Worrell had] "made up some of [his] statement." *Id.* at 42. [On cross-examination, Detective Worrell testified that when he first went to Crum's house to take his statement following the shooting, Crum told the detective that] "**he didn't know what he could tell [Detective Worrell] that was important**." *Id.* at 51. [After Detective Worrell explained he wanted Crum to look at some photographs at the station, he took him down to the police station where he took Crum's statement about what happened. *Id.* at 52. Detective Worrell testified that Crum told him he had been drinking the night of the shooting.] *Id.* at 54.

_____

D.A.:      How about the court reporter?

Crum:     No.  But the police did beat me up.

D.A.:      That's what you say, sir.

Crum:     That's what I know for a fact.  Fact, if I had a chance to say it in court, I would have said it, because I'm under oath.  [Bec]ause I was a little scared.  Then things changed.  This incarceration brings out the best—if I got to be punished for telling the truth, I rather get punished right now[.]

*Id.* at 20-21.  When Crum refused to answer any questions posed by the ADA regarding his statement, the court found him in contempt and sentenced him to an additional six months less one day in prison. *Id.* at 56-58.

- 5 -

\*　　\*　　\*

In addition to Detective Worrell, David Lee testified at Carter's first trial. Lee testified that he was with the victim, Crum, and two others when the Bronco pulled up. He testified that the only person he knew in the Bronco was Casey. Two of the three other individuals he described as a "little 5'6" light-skinned guy" and a black male who was "about six-two, six-three, [] medium-build." N.T. Jury Trial (First), 12/14/88, at 13-14. Lee then testified that the victim walked across the street to break up a fight between Casey and the rest of the guys from the Bronco. *Id.* at 16. Lee testified that Carter ("the taller guy") and "the light-skinned guy started punching [the victim]" in the middle of the street in front of the Bronco. *Id.* After that, Lee said, "it's like fights going on, people just punching, just going crazy." *Id.* at 17. At that time, Lee testified Crum was fighting with Casey about 15-30 feet from the middle of the street where the others were fighting. *Id.* Lee testified that Carter, Ski, and the victim "started moving all around . . . toward the corner on the other side of the street," that a "huge moving van came down the street," and then "all you heard was a pop." *Id.* at 19. Lee testified that the moving van blocked his view of the victim and Carter and Ski for about five to ten seconds when he heard the shot. *Id.* at 20. Once the van passed by, Lee testified that he saw Carter "walking off with [a small hand]gun in his hand" about ten to fifteen feet from where the victim was slumped over after he had been shot, but that he did not see where Ski was. *Id.* at 21-22, 37-38. Lee said that Carter and the group he arrived with got back into the Bronco and drove away. *Id.* at 23. On cross-examination, Lee testified that on March 10[, 1988] an investigator showed him a picture of Carter and that he told the investigator that "**the individual in the photograph bears no resemblance to the individual that [he] saw with the gun in his hand immediately following the shooting of** [**the victim**]." *Id.* at 45, 47 [emphasis added]. Lee also testified that he never saw the person in that photograph at the scene of the crime. *Id.* at 47. Finally, Lee testified that the picture was of Carter, "the guy over there" sitting in the courtroom. *Id.* at 48.

\*　　\*　　\*

Assistant District Attorney (ADA) Randolph Williams also testified as a Commonwealth witness at Carter's first trial.

- 6 -

ADA Williams was the Commonwealth's attorney at Carter's preliminary hearing. ADA Williams testified that he, Crum, and Detective Worrell all met in the hallway of the courthouse before the preliminary hearing. ADA Williams asked Crum if he had gone over his statement that he had given to detectives about the shooting and then proceeded to "[g]o over the statement line by line with him." N.T. Jury Trial, 12/14/88, at 7. ADA Williams testified that at the preliminary hearing Crum testified consistently with his statement and that he pointed to and identified Carter, who was sitting at counsel table, as the shooter. *Id.* at 9. Finally, Williams testified that neither he nor any other officers ever threatened or made promised to Crum or intimidated him in any way. *Id.* at 10.

*    *    *

[Carter's first] trial ended in mistrial [on December 22, 1988,] after the jury remained deadlocked.

*    *    *

[Carter] was retried weeks later [on January 18, 1989], but this time [Riddick[6] and] Crum[7] refused to testify [for risk of perjury], invoking [their] Fifth Amendment privilege. [Deeming Crum unavailable,[8] t]he Commonwealth was permitted to have Crum's testimony from the first trial[9] and

_____

[6] Although Riddick was granted immunity, he still refused to testify at Carter's second trial. *See* N.T. Immunity Petition Hearing, 1/26/89; N.T. Jury Trial, 2/2/89, at 440.

[7] In a motions hearing prior to the commencement of Carter's second trial, the court accepted Crum's invocation of the Fifth Amendment. *See* N.T. Motions/Jury Trial, 1/25/89, at 23-24.

[8] In its brief, the Commonwealth acknowledges that Casey "was similarly determined to be unavailable" at Carter's second trial, "though the reason is not stated." Appellee's Brief, at 8.

[9] Court reporter Bonnie Smith, who took down Crum's testimony at the first trial, read the notes of testimony into the record at the second trial. *See* N.T. Jury Trial (Second), 1/27/89, at 18-29, 32, 35-36, 38-166. Moreover, court reporter Gregory Romano, who transcribed Crum's preliminary hearing
*(Footnote Continued Next Page)*

his preliminary hearing testimony read into the record] and called [D]etective [Worrell,] who took Crum's initial [post-incident] statement[,] to testify that Crum [testified consistently with his statement at the preliminary hearing— that he saw Carter shoot the victim and that the] statement was not coerced.[10]  Additionally, the Commonwealth called the A.D.A. Willliams, who questioned Crum at the preliminary hearing, to testify that Crum did not complain of any threats or indicate that his proposed testimony was false.  The [c]ourt then [] instructed the jury that the preliminary hearing testimony could be used as substantive evidence, while Crum's testimony at the first trial, which contained references to his preliminary hearing testimony, was impeachment evidence [that] could only be used to determine credibility.[11]

_____

testimony, read the notes of testimony into the record at the second trial.  *Id.*, 1/31/89, at 295-327.  However, Crum's statement taken by Detective Worrell following the shooting was not read into the record, but was admitted as a trial exhibit.  *See id.* at 178.

[10] Detective Worrell testified at the first trial that right before trial, Crum told him that "I not gonna testify, I'm just not testifying in this case . . .  I know you can't make me do it."  N.T. Trial, 12/13/88, at 40.  Detective Worrell then testified that Crum told him he would not testify to the parts of his statement that Detective Worrell "made [him] sign" and alleged that Detective Worrell had "made up some of [his] statement."  *Id.* at 42.

[11] At Carter's second trial, the court gave the following jury instruction, with regard to how to consider Crum's testimony at Carter's first trial, preliminary hearing testimony, and statement to police as follows:

> In this case you heard the testimony of one William Crum from another proceeding[, Carter's first trial,] read into the record, and in that testimony there were references to a statement that he allegedly gave to Detective Worrell, and also a reference to testimony that he allegedly gave at a preliminary hearing.

> Now, insofar as the testimony of Mr. Crum that was read into the record, that included those two items.  That evidence, that testimony in that evidence concerning the statement and the preliminary hearing only in the testimony that was read all at once

*(Footnote Continued Next Page)*

* * *

[To show that Carter knew Casey, the trial court allowed the Commonwealth to call Police Officer Alfred Baker as a witness to testify that he had seen Carter and Casey standing next to each other and behind three men who were

_____

from the two days, I think it was something like [160] pages of testimony, that evidence may be considered by you for one purpose only, that is, to help you judge the credibility and weight of the testimony given by Mr. Crum as a witness in this case.

You may not regard the evidence concerning that testimony as to the questions and answers put to him by counsel concerning what the statement allegedly said and what his testimony was at the preliminary hearing. You may not regard that evidence of a prior inconsistent statement as proof of the truth of any matter asserted in that statement or in the prior testimony at the preliminary hearing.

Now, that ruling that I've given you does not apply to the reading into the record of the testimony by itself that Mr. Crum is alleged to have given in the preliminary hearing. If you will recall, there was a separate reading of that testimony into the record beyond what was done in the reading of his total testimony in another proceeding. My instruction applies only to that total testimony in another proceeding not to the testimony at the preliminary hearing that was read separately. I hope that's clear to you.

Now, that total testimony that was read separately, of course, you may consider that, if you wish, as substantive evidence.

* * *

You will recall the witness' testimony, that is, Mr. Crum's testimony, insofar as identification, where his previous testimony in another proceeding was that he had been beaten, and the identification was suggested to him, and he had been beaten, that's why he made whatever statement he made, and that's why he made whatever identification he made. That's for you to consider, if you feel that that in any way weakened his identification.

N.T. Jury [Second] Trial, 2/3/89, at 584-88.

- 9 -

sitting on the porch of a house, located at 2611 Roberts Avenue in Philadelphia, approximately six weeks after the instant shooting. N.T. Jury Trial (Second), 1/31/89, at 328-29. Officer Baker, who was at City Hall to testify in the instant matter, testified that on November 20, 1987, he saw Casey in the hallway in City Hall tell Carter, as he left courtroom 613, "Don't worry, Brother. I'll take care of you and your family, and at that time Carter turned around and smiled and grinned at Casey." *Id.* at 331.]

\* \* \*

Finally, Commonwealth witness Christopher Small testified that he saw three individuals fighting and that the tallest of the three pulled the victim behind the truck. He did not see the shooting, but heard a gunshot moments later.[12]

\* \* \*

Statement Biography forms for the three men show that Kim Riddick is approximately 5'7" in height, Mark Casey is approximately 5'6", and [Carter] is 6'3".

*Commonwealth v. Carter*, 2723 EDA 2008 (Pa. Super. filed April 15, 2020) (unpublished memorandum decision), quoting Trial Court Opinion, 8/14/09, at 2-3. No forensic evidence linked Carter to the crime and no weapon was ever found.[13] *See* N.T. Jury Trial, 12/14/88, at 100 (Officer McBride testifying no weapon or projectiles were found at crime scene). On February 3, 1989,

_____

[12] At Carter's second trial, Small testified that he did **not** see anyone "drag Mike along the ground and shoot him." N.T. Jury Trial, 2/1/89, at RR. 82-83.

[13] Officer Anthony McBride of the Philadelphia Police Department testified that he found the following physical evidence at the scene: two hats (a roll-up type hat and a baseball hat); a white t-shirt; blood samples in front of different buildings; a piece of white cloth; and three shirt buttons. *See* N.T. Jury Trial, 12/14/88, at 81-83.

the jury convicted Carter[14] of first-degree murder[15] and PIC.[16] Carter was sentenced to life in prison.

On February 8, 1989, Carter filed a post-verdict motion, alleging: (1) the verdict was contrary to the evidence; (2) the verdict was against the weight of the evidence; (3) the verdict was contrary to the law; (4) the Commonwealth did not prove murder and PIC beyond a reasonable doubt; (5) the trial judge erred by permitting the Commonwealth to *voir dire* the jury on the death penalty; (6) the trial judge erred by allowing Crum to invoke his Fifth Amendment privilege. ***See*** Motion for New Trial, 2/8/89, at 1-2. While the motion was pending, defense counsel filed a motion[17] for a new trial alleging after-discovered evidence.

On March 22, 1990, the court held a hearing on Carter's after-discovered evidence and post-trial motions. Riddick, who refused to testify at either of Carter's trials[18] or at the preliminary hearing, testified at this hearing that he

_____

[14] The Commonwealth *nolle prossed* several charges, including carrying firearm without a license, carrying firearms in public in Philadelphia, and involuntary manslaughter. Carter was found not guilty of voluntary manslaughter. ***See*** Court of Common Pleas of Philadelphia County, Criminal Docket (CP-51-CR-1019501-1097), at 4-5.

[15] 18 Pa.C.S.A. § 2502(a).

[16] 18 Pa.C.S.A. § 908.

[17] Due to the state of this very old record, we are unable to determine the exact date that this motion was filed.

[18] In fact, Riddick absented himself prior to Carter's first trial, which ended in a mistrial, and was finally found and arrested following the mistrial. ***Id.*** at 3. *(Footnote Continued Next Page)*

- 11 -

saw Casey shoot the victim and that the only reason he gave statement implicating Carter was because he "was scared for [his] life . . . [b]ecause [] Casey told [him] if [he] would have testified[,] that he was going to kill [him] or do something to [his] family." N.T. Post-Trial Motion Hearing, 3/22/90, at 7-8. At the hearing, Riddick denied ever having seen Carter get out of the truck at the scene of the shooting, *id.* at 16, but admitted that [Riddick] had gotten into a fight with Crum. *Id.* The court denied Carter's post-verdict motions and imposed the judgment of sentence on May 31, 1990.

Carter filed a timely direct appeal on June 8, 1990. This Court affirmed Carter's judgment of sentence on July 8, 1991, concluding counsel had abandoned Carter's weight and sufficiency of the evidence issues on appeal. *See Commonwealth v. Carter*, No. 1705 Philadelphia 1990, *5-*6 (Pa. Super. filed July 8, 1991) (unpublished memorandum decision) (Court did not reach merits of sufficiency and weight claims where Carter "failed to offer any support for these contentions in the argument section of his brief").[19] Carter

_____

Riddick was then remanded into custody, but invoked the Fifth Amendment and refused to testify at Carter's second trial. *Id.* Even after Riddick was granted immunity to testify, he refused and was found in contempt and sentenced to serve a prison term. Following Casey's death, Riddick came forward and claimed that Casey was the shooter. *Id.*

[19] In its decision on direct appeal, this Court referenced Carter's weight argument in its entirety as follows, "Additionally, if you were to take away the **admittedly perjured testimony of William Crum**, and its prejudicial harm, it is abundantly clear the evidence at trial was insufficient." *Id.* at *6 (emphasis added). Notably, at this time Detective Worrell's "pattern and practice" of coercing confessions in homicide cases had come to light. *See infra* at 27-28, n.34.

filed a petition for allowance of appeal that was ultimately dismissed as improvidently granted. *Id.*, 634 A.2d 612 (Pa. filed Dec. 8, 1993) (Table).

Carter filed his first PCRA petition, *pro se,* on January 23, 1996.[20] The court appointed counsel, who filed an amended petition seeking a new trial alleging that there was newly-discovered evidence in the form of three eyewitnesses to the crime. Specifically, attached to the petition were witness affidavits averring that Barry Mallory, Derrick Williams (Derrick),[21] and Julian Williams (Julian) were willing to testify that they saw Casey, rather than Carter, shoot and kill the victim. Allegedly, Mallory and Derrick recognized Carter in jail and told him that they saw the shooting and that the perpetrator was Casey. Mallory and Derrick also allegedly informed Carter that Julian, who was imprisoned in another facility, was willing to identify Casey as the victim's shooter. The court denied Carter's petition, without a hearing, and Carter filed an appeal.

On appeal, this Court vacated the trial court's PCRA order and remanded the matter for an evidentiary hearing on his newly-discovered evidence claim, concluding that "a hearing should have been conducted to determine the merits of the proposed testimony of Julian Williams, Derrick Williams[,] and

---

[20] Carter's first petition was deemed timely because his judgment of sentence became final before the effective date of 42 Pa.C.S.A. § 9545, the petition was his first, and the petition was filed within one year of the effective date of section 9545, or by January 16, 1997. *See Commonwealth v. Fenati*, 748 A.2d 205, 206-07 (Pa. 2000).

[21] At the time of the shooting, Carter did not know Derrick or Mallory.

Barry Mallory." *See Commonwealth v. Carter*, 742 A.2d 201, *8 (Pa. Super. 1999) (Table).[22] Following three days of hearings held in July, August, and October of 2000, the PCRA court denied Carter's petition on December 21, 2001, stating "Petitioner has not met the requirements of 42 Pa.C.S.[A.] § 9543(a)(2)(vi) as to the unavailability of the exculpatory evidence which would have changed the outcome of the trial." Order, 12/21/01.[23]

Carter filed an appeal from the denial of his PCRA petition and, on April 26, 2002, our Court entered a per curiam order dismissing Carter's appeal due to counsel's failure to file a required Pa.R.A.P. 3517 docketing statement. *See Commonwealth v. Carter*, 704 EDA 2002 (Pa. Super. filed April 26, 2002) (per curiam order). In the dismissal order, our Court directed that "counsel shall file a certification with this Court within 10 days of the date of this order, stating that the client has been notified of the entry of this order." *Id.* On June 18, 2002, the docket reveals that the Superior Court Prothonotary remitted the matter to the trial court, noting "no trial court record." *Id.* This

---

[22] To make matters more complicated, with regard to the relevant procedural and factual timeline, the docket entries in the certified record on appeal only go back as far as September 8, 1999, when the case was reassigned to the Honorable Willis W. Berry, Jr.

[23] Seven and one-half years later, the trial court issued an opinion explaining the reason it denied Carter's petition was because it did not find the three witnesses credible, as they gave "widely divergent accounts of what happened[,]" even though they allegedly witnessed the "events from no more than 15-40 feet away". Trial Court Opinion, 8/14/09, at 4. This Court is unaware as to the reason for the significant lapse in time for the preparation of the opinion.

Court's docket does not reveal that counsel filed the ordered certification notifying Carter about the dismissal of his appeal.

On October 12, 2007, Carter filed a second PCRA petition in which he sought reinstatement of his appellate rights from the denial of his first PCRA petition, citing *Commonwealth v. Bennett*, 930 A.2d 1264, 1272 (Pa. 2007), 42 Pa.C.S.A. § 9545(b)(1)(ii) (PCRA's newly-discovered fact exception), and alleging that counsel failed to notify him of the dismissal of his collateral appeal.[24] The Commonwealth filed a motion to dismiss Carter's petition, claiming that because Carter failed to identify the exact date[25] he

_____

[24] In *Bennett*, the defendant averred he was unaware that this Court had dismissed his appeal until two months after the dismissal. On appeal, our Court found subsection (b)(1)(ii) of the PCRA facially applied to the defendant's claim and remanded the case for a hearing where the defendant had established he exercised due diligence in discovering the dismissal.

Instantly, Carter alleged that the trial court "directed counsel to file a certification within 10 days of April 26, 2002[,] stating that [Carter] had been notified of the entry of the Court's order dismissing the appeal. However, the docket of the Superior Court does not reflect that counsel complied with that Order." PCRA Petition, 10/12/07, at ¶ 8.

[25] In his memorandum of law in opposition to the Commonwealth's motion to dismiss Carter's petition, Carter avers that "on July 8, 2004, [Carter] received a letter from the Prothonotary of the Superior Court . . . enclos[ing] a copy of the docket entries in the above matter." Memorandum of Law in Opposition to Motion to Dismiss PCRA Petition, 7/8/08, at 3. However, Carter claims that because the law did not grant him relief at that time, and "the door did not open until the Supreme Court reversed the ruling of the Superior Court [in *Bennett*] on August 23, 2007, he filed his petition within 60 days of *that* date, or on October 12, 2007. *See id.* at 4-5 ("[T]he present petitioner takes the position that until August 23, 2007, there was no legal way he 'could have' presented his claim of abandonment of counsel to a PCRA court and expect that such a contention would have been considered jurisdictionally permissible.").

became aware of the dismissal of his collateral appeal, he did not qualify for an exception to the PCRA time bar. *See* Commonwealth Motion to Dismiss, 6/23/08, at 6; *see also* 42 Pa.C.S.A. § 9545(b)(2). Following a hearing, the court granted Carter his requested relief on September 11, 2008, and permitted him to file a *nunc pro tunc* collateral appeal. *See* N.T. PCRA Hearing, 9/11/08, at 17-19; *see also* 9/11/08 Criminal Docket Entry at CP-51-CR-1019501-1987 by Judge Willis W. Berry, Jr. ("PCRA Appeal Rights Granted *Nun*[*c*] *Pro Tunc*). However, on April 15, 2010, our Court quashed the appeal, concluding Carter's underlying PCRA petition was untimely filed, that he failed to plead and prove an exception to the PCRA time bar, and, thus, that the PCRA court was without jurisdiction to reinstate Carter's appellate rights. *See Commonwealth v. Carter*, 998 A.2d 1009 (Pa. Super. 2010) (Table). On December 29, 2010, the Pennsylvania Supreme Court denied Carter's petition for allowance of appeal. *See id.*, 12 A.3d 369 (Pa. 2010) (Table).

On September 30, 2020, Carter filed the instant PCRA petition raising the PCRA's newly-discovered evidence and governmental interference exceptions, *see* 42 Pa.C.S.A. §§ 9545(b)(1)(i)-(ii), based upon the alleged misconduct of one of the investigating officers. Specifically, Carter alleged that in October 2019 he became aware that Detective Worrell, to whom Crum had given his statement implicating Carter as the shooter, has "engaged in a pattern and practice of eliciting false confessions and witness statements." PCRA Petition, 9/30/20, at ¶ 6; *see also* N.T. PCRA Hearing, 1/23/23, at 4

("[I]n a series of cases . . . starting in [] 1990[-19]91, [Detective Worrell] used coercion and intimidating beatings to elicit false confessions and false witness statements."). On October 27, 2020, October 6, 2021, and September 19, 2022, Carter filed amended/supplemental PCRA petitions, including an after-discovered evidence claim, as well as a **Brady**[26] claim, based upon Detective Worrell's misconduct. On July 19, 2022, December 13, 2022, and January 23, 2023, the trial court held argument on the after-discovered evidence and **Brady** issues. **See** N.T. Argument, 12/13/22, at 5-6.

Following argument, the PCRA judge denied Carter's petition on February 3, 2023, acknowledging that Carter proved an exception to the timeliness requirement of the PCRA, but concluding that he "cannot be influenced that it's after-discovered evidence that would have changed the jury's verdict because **it cannot change the jury's verdict if it hadn't existed yet. So for that reason I am denying your petition**." N.T. PCRA Hearing, 1/23/23, at 13 (emphasis added). Despite the court noting that "these things could have happened, and he may have been the first [to make this claim,]" nonetheless the court denied relief stating, "I just can't wrap my hand [sic] around saying that [the] jury would have reached a different verdict with no different evidence **because it hadn't happened yet**." **Id.** at 14 (emphasis added).

_____

[26] **See Brady v. Maryland**, 373 U.S. 83 (1963).

However, more than three and one-half months later in his Rule 1925(a) opinion, the PCRA judge stated that he denied Carter's petition because "**there was enough independent evidence to uphold the jur[y]'s decision**" by relying on the testimony from defense witness Small, who "provided testimony of defendant's presence, position, and physical height that confirms the conviction."[27]   Trial Court Opinion, 5/9/23, at 3 (emphasis added).   ***But see*** N.T. PCRA Hearing, 1/23/23, at 14-15 (PCRA judge

---

[27] The certified record reveals that the trial court dismissed Carter's petition on February 3, 2023, but did not issue Pa.R.Crim.P. 907 notice of its intent to dismiss the petition until eleven days later, on February 14, 2023.  ***See*** N.T. Hearing, 3/6/23, at 3-4 (court acknowledging "formal [Rule] 907  sent today" and even though defense counsel had already filed notice of appeal from court's February 3, 2023 dismissal order, counsel would be "fil[ing] another one just to be . . . safe").  We have previously held that notice of the intention to dismiss under Rule 907 is mandatory and failure to comply with the rule is reversible error.  ***Commonwealth v. Wooden***, 215 A.3d 997, 1001 (Pa. Super. 2019).  ***See also Commonwealth v. Feighery***,  661 A.2d 437, 439 (Pa. Super. 1995) (mandating remand under Rule 907's predecessor, Pa.R.A.P. 1507, where court failed to issue mandatory notice of intent to dismiss); Pa.R..Crim.P. 907(1) ("[T]he judge **shall** give notice to the parties of the intention to dismiss the petition and shall state in the notice the reasons for the dismissal.  The defendant may respond to the proposed dismissal within 20 days of the date of the notice.  The judge thereafter shall order the petition dismissed, grant leave to file an amended petition, or direct that the proceedings continue.") (emphasis added).  Recently, in ***Commonwealth v. Vo***, 235 A.3d 365 (Pa. Super. 2020), our Court reiterated that "service of any notice of dismissal, whether in the form of a Rule 907 notice by the court, or a ***Turner/Finley*** letter, must occur at least twenty days prior to a dismissal." ***Id.*** at 372, citing ***Commonwealth v. Hopfer***, 965 A.3d 270, 275 (Pa. Super. 2009).

Because Carter did not raise the issue on appeal, it is waived.  ***See Commonwealth v. Guthrie***, 749 A.2d 502, 503 (Pa. Super. 2000); ***Commonwealth v. Boyd***, 923 A.2d 513 (Pa. Super. 2007) (same). Nevertheless we caution the trial court in future instances to comply with the mandatory notice provisions of Rule 907.

acknowledging he "didn't get to the prejudice analysis" when the district attorney stated that "there is enough evidence to support the conviction"). Specifically, in its Rule 907 notice, the PCRA court gave the following reason, among others, regarding why it intended to dismiss Carter's petition without a hearing:

> This [c]ourt must decide whether[,] discounting Crum's testimony, would the jury have come to a different adjudication. This court looked [at] untainted trial evidence [that] establishes defendant's guilt. Most notably, defense witness [] Small, who testified at the second trial where defendant was convicted, provided testimony of defendant's presence, position, and physical height that confirms this conviction. Multiple witnesses stated that the shooter was by far the tallest person at the scene. [Carter] is by far the tallest person who was at the scene. In addition, other witness testimony established that the other men present were significantly shorter than [Carter]. At the second trial, [] Small testified that the other two men with [Carter—]Casey and [] Riddick[—]were about 5' 7" and 5' 4" tall. Small referred to Riddick as "the little guy" during his testimony as well. Although [Carter] was undoubtedly present during the 1987 murder and although he presumably knew exactly what happened at the time of his 1988 and 1989 trials, he waited until [] Casey died in 1990 to begin pointing the finger at him. There is no credible evidence to support that allegation. This [c]ourt cannot grant new trials to every defendant in a case that Detective Worrell was involved with. [W]e must look to the other evidence and ask [whether] the jury verdict [would] be different absent the claims against Detective Worrell. **Here, [t]his [c]ourt determined that there was enough independent evidence to uphold the jur[y']s decision.**

Rule 907 Notice of Intent to Dismiss, 2/14/23, at ¶ 3 (emphasis added).[28]

_____

[28] The docket also reveals that on March 6, 2023, the court issued another Rule 907 notice. Finally, on March 10, 2023, one week _after_ Carter filed his notice of appeal from the first dismissal order, the court entered a second order dismissing Carter's PCRA petition. We note that once Carter filed his
*(Footnote Continued Next Page)*

Carter filed a timely notice of appeal and court-ordered Pa.R.A.P. 1925(b) concise statement of errors complained of on appeal. Carter presents the following issues for our consideration:

(1) Did the PCRA court err in concluding that the after-discovered evidence of Detective Worrell's pattern and practice of misconduct would not be likely to result in a different verdict if a new trial were granted?

(2) With respect to [Carter's] due process claim under ***Brady v. Maryland***, 373 U.S. 83 (1963), did the PCRA court err in concluding that there would have been no reasonable probability of a different outcome at trial had defense counsel been provided with the evidence of Detective Worrell's misconduct and had the opportunity to present it to the jury?

(3) Did the PCRA court err in concluding that the Commonwealth's actions at trial did not violate due process and ***Napue v. Illinois***, 360 U.S. 264, 269 (1959),[29] where the Commonwealth presented false evidence at trial through [] Crum's police statement and preliminary hearing testimony and Detective Worrell's trial testimony?

(4) To the extent that it reached the merits, did the PCRA court err by denying [Carter's] actual innocence claim and declining to find that the Pennsylvania and United States Constitutions support a cognizable and freestanding basis

_____

notice of appeal on March 3, 2023, the trial court no longer had jurisdiction to "**act further in the matter**." ***Commonwealth v. Klein***, 781 A.2d 1133, 1135 (Pa. 2001) (emphasis added).

[29] It is well-settled that the Commonwealth violates a defendant's right to due process when it withholds evidence that is both favorable to the defense and material to the defendant's guilt or punishment. ***Brady***, 373 U.S. at 87; ***see also United States v. Bagley***, 473 U.S. 667, 676 (1985) (Commonwealth violates ***Brady*** by failing to disclose exculpatory evidence as well as evidence that may be used to impeach prosecution witness). "When the reliability of a given witness may well be determinative of guilt or innocence, nondisclosure of evidence affecting credibility falls within this general rule." ***Napue***, 360 U.S. at 269.

> for relief in a case involving and individual who is actually
> innocent of the crime for which he is convicted?

Appellant's Brief, at 4-5.

We review the decision to deny PCRA relief to determine whether the decision "is supported by evidence of record and whether it is free of legal error." **Commonwealth v. Hart**, 199 A.3d 475, 481 (Pa. Super. 2018).[30]

---

[30] Where, as here, a petitioner files an untimely PCRA petition, that petition must invoke and the petitioner must prove a section 9545(b)(1) exception to overcome the PCRA time bar. Here, Carter invoked, and the trial court found he pleaded and proved, the "newly-discovered facts" exception, set forth in section 9545(b)(1)(ii), raising the alleged corruption of Detective Worrell and that the officer was responsible for eliciting Crum's inculpatory statement. Section 9545(b)(1)(ii) provides that "the facts upon which the claim is predicated were unknown to the petitioner and could not have been ascertained by the exercise of due diligence." 42 Pa.C.S.A. § 9545(b)(2)(ii). Finally, a petition invoking one of these exceptions must "be filed within one year of the date the claims could have been presented." Id. at § 9545(b)(2).

In his petition, Carter asserts that he raised the issue of Detective Worrell's corruption within the required time frame of discovering it, when the Commonwealth filed documents in an unrelated homicide case, **Commonwealth v. Veasy**, No. 92-06-4252-4262 (Philadelphia County), which involved Worrell's misconduct. **See** PCRA Petition, 9/20/20, at 2-3. **See** 42 Pa.C.S.A. § 9545(b)(2). Here, Carter has consistently contended that he was innocent. As an inmate, Carter exercised due diligence in uncovering the facts about the Commonwealth's admission that Detective Worrell had elicited false statements and/or confessions in other homicide investigations where Carter was limited in resources and found the filings once they were made public. Moreover, as has been repeatedly acknowledged by the PCRA court in this case, Carter's claim of Detective Worrell's alleged misconduct in his case appears to be, chronologically, the first documented case of misconduct against this officer. Thus, this case represents the epitome of "facts upon which [a] claim is predicated [that] were unknown to the petitioner and could not have been ascertained by the exercise of due diligence." 42 Pa.C.S.A. § 9545(b)(2)(ii). Because the issue of whether he pleaded and proved an exception is not raised on appeal and the Commonwealth does not contest it, we need not analyze it further.

Once jurisdiction has been properly invoked under the PCRA, *see supra* at n.24, the relevant inquiry becomes whether the petitioner has raised a cognizable claim. Section 9543 of the PCRA delineates seven categories that are eligible for relief under the PCRA. *See* 42 Pa.C.S.A. §§ 9543(a)(2)(i)-(viii). Instantly, Carter raises the after-discovered evidence claim, which asserts "the unavailability at the time of trial of exculpatory evidence that has subsequently become available and would have changed the outcome of the trial if it had been introduced." *Id.* at § 9543(a)(2)(vi).

In order to prove an after-discovered evidence claim, a petitioner must establish that:

> (1) the evidence has been discovered after trial and it could not have been obtained at or prior to trial through reasonable diligence; (2) the evidence is not cumulative; (3) it is not being used solely to impeach the credibility; and (4) it would likely compel a different verdict.

*Commonwealth v. D'Amato*, 856 A.2d 806, 823 (Pa. 2004), citing *Commonwealth v. Abu-Jamal*, 720 A.2d 79, 94 (Pa. 1998). Moreover, where the after-discovered evidence takes the form of an officer's undisclosed misconduct, a PCRA petitioner bears the burden of establishing a direct "nexus" between the undisclosed misconduct and the petitioner's case. *See Commonwealth v. Foreman*, 55 A.3d 532, 537-38 (Pa. Super. 2012). As our Court has recognized, it is well-settled that "evidence of police misconduct in an unrelated case does not qualify as after-discovered evidence, as it would only be used for impeachment purposes." *Commonwealth v. Brown*, 134 A.3d 1097, 1109 (Pa. Super. 2016). However, "evidence does not merely

impeach credibility when it establishes an alternative theory of the commission of the crime or contradicts the only link of the defendant to the offense." ***Commonwealth v. Holmes***, 920 EDA 2023 (Pa. Super. filed Nov. 14, 2024) (unpublished memorandum), ***citing Commonwealth v. Crumbley***, 270 A.3d 1171 (Pa. Super 2022); ***Commonwealth v. McCracken***, 659 A.2d 541 (Pa. 1995).

Here, Carter's current PCRA petition and supplemental/amended petitions specifically set forth information explaining exactly how Detective Worrell committed misconduct in **this** case and how that misconduct affected the statement obtained from **the only eyewitness** claiming to have seen Carter shoot the victim. ***Cf. Commonwealth v. Presbury***, 296 A3d 579, *7-*8 (Pa. Super. 2023) (Table)[31] (where petitioner, in supplemental/amended PCRA petition, only alleged Detective Worrell "generally engaged in a practice of forcibly coercing false confessions[, our Court agreed with trial court that petitioner] failed to set forth any specific information or evidence that 'the detectives committed misconduct **in this case**'") (emphasis added).

Notably, Detective Worrell was the only detective who interviewed and obtained a statement from Crum—the **only** eyewitness that both identified Carter and stated that he saw Carter shoot the victim. Moreover, Crum testified at the first trial that he told Detective Worrell, immediately following the shooting, that he did not see anything because he was on the ground

---

[31] ***See*** Pa.R.A.P. 126(b)(2) (non-precedential decisions of Superior Court filed after May 1, 2019 may be cited for persuasive value).

fighting at the time of the shooting; however, after Detective Worrell brought Crum to the police station and questioned him for over two hours, Crum then gave a statement identifying Carter as the shooter.[32] **See McCracken**, **supra** (only eyewitness to identify defendant as shooter first told police he could not identify person he saw enter and leave crime scene, then, three days later, positively identified defendant, testified consistently with second statement at preliminary hearing, testified consistently at trial that he saw defendant commit crime, and then, when serving an unrelated sentence in New Jersey, recanted testimony he gave in **McCracken** case stating he needed to "clear his conscience" and that detectives had repeated defendant's name to him and "suggest[ed defendant] was perpetrator); **id.** at 547-48 (although only eyewitness in shooting admitted to being beaten and threatened because he testified in **McCracken** case and trial court found credible Commonwealth witnesses who testified eyewitness had been threatened to recant, trial court ordered new trial "because it was convinced that a different verdict would likely result from the recantation testimony, [defense counsel's] testimony, and the evidence presented at [defendant's] trial").

With regard to identification evidence from others at the scene, neither Lee, Riddick, nor Small identified Carter as the shooter; in fact, Riddick did not even hear a gun shot at the scene. Lee testified that a moving van

_____

[32] Moreover, several other interviews were conducted in Detective Worrell's presence.

obscured his view of the shooting, but that "[a]fter the moving van got by[,] I saw one of Casey's friends carrying a gun in his right hand and Casey said let's get out of here and all 4 got back in the Bronco and drove up Haines St[reet] toward Germantown Ave[nue]." Investigation Interview Record of David Lee, 9/11/87, at 2. Lee identified "[t]he tall one [who] was about 6'2" or 6'3" as the one who had the gun at the scene. *Id.* However, Lee stated that he did not see the gun prior to hearing the gunshot and also did not see anyone point the gun at the victim. *Id.* at 3; *id.* at 5 ("I just heard the shot and seen [sic] the guy walking away with the gun."); *id.* (Lee stating "maybe 10 seconds at the most" elapsed between hearing the shot and then seeing man walking away with gun). *See McCracken*, 659 A.2d at 544 (other than only eyewitness who recanted his testimony that he saw defendant commit murder, remaining witnesses could only identify perpetrator by "[giving] descriptions of the man and what he was wearing").

In its opinion, the trial court concludes that the fourth prong of the after-discovered evidence test—that the evidence "would likely compel a different verdict"—was not proven because "there was enough independent evidence to uphold the jur[y's] decision," primarily relying on Small's testimony. *See also* Appellee's Brief, at 34 (Commonwealth claiming only Small's testimony from second trial necessary to sustain Carter's verdict). Moreover, the court states that there was "significant evidence, outside of Detective Worrell's contribution, which the jury used to convict [Carter] **and enough that the Superior Court affirmed**." Trial Court Opinion, 5/9/23, at 6 (emphasis

added). Finally, the trial court states in its Rule 907 dismissal notice that in order to analyze Carter's after-discovered evidence claim, it "must decide whether[,] discounting Crum's testimony, [] the jury [would] have come to a different adjudication." Rule 907 Notice of Intent to Dismiss, 2/14/23, at ¶ 3.

In Small's first statement made on the same day as the shooting, Small says that "one of the guys from the Bronco [and the victim] moved behind the moving truck . . . when he heard a loud gunshot [and that] the three guys got in the Bronco and drove off and everybody else came from behind the moving truck saying [the victim] got shot **by the guys in the Bronco**." Statement of Chirstopher Small, 9/11/87, at 1-2 (emphasis added). In Small's second statement taken by Detectives Worrell and Murray one week later, Small says that "**the big guy** came after [the victim] and got behind the van [and t]hat's when [Small] heard the shot." Statement of Christopher Small, 9/18/87, at 2 (emphasis added). Small never identified Carter and, most importantly, testified that he never saw the victim get shot or saw anyone with a gun at the scene. *See* N.T. Jury Trial, 2/1/89, at 376-419. In fact, the Commonwealth admits that "as a defense witness, [Small] could not definitively state that [Carter] was the tall man who was fighting with decedent." Appellee's Brief, at 28.

With regard to the PCRA judge's statement that there was "enough" evidence to convict Carter, independent of anything procured by Detective Worrell, we are mindful, in contravention of the statement by the trial court, that on direct appeal our Court never addressed the sufficiency of the evidence

on its merits, but, rather, found Carter's sufficiency and weight of the evidence issues "abandoned" due to counsel's failure to develop the argument. *See Commonwealth v. Carter*, *supra* at \*5-\*6.

Additionally, with regard to circumstantial evidence, as we previously noted, there was no forensic evidence linking Carter to the murder. *Cf. McCracken*, *supra* (even where gunshot residue found on defendant's hand, Supreme Court remanded for new trial, based on after-discovered evidence, where state's only eyewitness recanted her statement after trial). Finally, the trial court's statement that the after-discovered evidence consists of discounting Crum's testimony is inaccurate. Rather, the after-discovered evidence proffered by Carter in the current PCRA petition is Detective Worrell's practice of compelling confessions, evidence that potentially buttresses Crum's reason for recanting his eyewitness statement and preliminary hearing testimony.

After a comprehensive review of the record, and correctly framing the "after-discovered" evidence offered by Carter, we conclude that it would likely compel a different verdict. *See McCracken*, 659 A.2d at 549-50 (only eyewitness's "recantation is not merely cumulative or corroborative given the tenuous nature of circumstantial evidence connecting [defendant] to the crime and the inability of any other witness to make a positive identification of the perpetrator." [W]here the only Commonwealth witness who identified the perpetrator has recanted his testimony, such evidence cannot be considered cumulative or corroborative because the defendant claimed that he did not

commit the crime in question."). First we do not find that the facts support the PCRA court's conclusion that there was "significant evidence" to support Carter's first-degree murder conviction independent of Crum's statement and preliminary hearing testimony. Aside from Crum, no one who heard the shot or saw an individual with a gun in their hand at the scene ever identified Carter. *See McCracken*, 659 A.2d at 545 (where victims' descriptions of perpetrators fit both defendant and other man and other man found in possession of murder weapon, "jury must have placed considerable weight on [only eyewitness's] testimony" to return second-degree murder conviction).

Second, the court's on-the-record statement that it "just couldn't get around the after-discovered evidence that didn't exist at the time to tell the jury," is based on faulty reasoning and adds an element to the well-established after-discovered evidence test.[33] It is true that there can be no "pattern and practice" of something that has not happened before. However, there must be a first time for everything, including police misconduct. This may well be the "first" documented case of a coerced confession by Detective Worrell, especially given that the nefarious investigations conducted by homicide officers in the Philadelphia Police Department, that led to the Commonwealth discharging defendants, took place in the early 1990s—after Crum gave his statement in September 1987. *See Veasy v. City of Philadelphia*, CV-

---

[33] The Commonwealth makes a similar claim in its brief, noting that "it cannot be reasonably argued that [Carter] was denied a fair trial given the evidence that was available at the time. The Commonwealth's concessions of Worrell's pattern and practice related to events that occurred 2-3 years after [Carter] was convicted." Appellee's Brief, at 28.

05107 (E.D. Pa. 2020), Complaint, 10/15/20, at 1 ("[]Veasy's conviction for a crime he did not commit was neither an accident nor an isolated instance of police misconduct. Rather, [he], like many other Black men from Philadelphia **in the period 1985-1995**, was the victim of Philadelphia Police Department homicide detectives who routinely engaged in investigative misconduct[.]") (emphasis added). ***See also* The Philadelphia Inquirer**, *'The Wrong Man'* *Series,* 1/15/25 (article indicating Philadelphia District Attorney investigating July **1988** murder conviction, where Detective Worrell was lead detective in case, where witnesses say defendant was not in store where victim killed in crossfire).

To shed light on the potential import of this evidence, even the Commonwealth concedes in its brief that if the jury had been made aware of the information about Detective Worrell during the pendency of trial, and if Crum's testimony were considered to be sufficiently discredited in light of Detective Worrell's misconduct in other cases, "the Commonwealth may not have called Crum or Worrell as witnesses." Appellant's Brief, at 28. Without Crum or Detective Worrell as witnesses, the jury would likely have returned a different verdict, such as a lesser degree of homicide. ***See Commonwealth v. Bonaccurso***, 625 A.2d 1197, 1200 (Pa. Super. 1993) (holding change in degree of guilt is considered "change in outcome of trial" for purposes of after-discovered evidence). ***See*** N.T. Jury (Second) Trial, 2/3/89, at 592 (court instructing jury, "Now, unless you are returning a verdict of first[-]degree murder, you may find [Carter] guilty of third[-]degree murder if you are

satisfied that[:] the [victim] is dead; that [Carter] killed him; and . . . that the killing was with malice[.]"); *id.* at 594 (judge instructing jury, "[u]nless you are returning a verdict of murder, you may find [Carter] guilty of voluntary manslaughter").

In light of the foregoing and in the interests of justice, we conclude that Carter is entitled to a new trial on the basis of after-discovered evidence. Simply put, the trial court's reasoning and factual basis do not support its decision to deny Carter's petition. *Commonwealth v. Brown*, 648 A.2d 1177, 1190 (Pa. 1994). Not only has Crum recanted, but Detective Worrell's credibility in taking Crum's statement is now severely called into question and may well prompt the Commonwealth to not call Detective Worrell as a witness at a new trial due to his lack of credibility. Where Crum was the **only** eyewitness who identified Carter and testified he saw Carter shoot the victim, his recantation evidence is not considered corroborative. *See McCracken*, *supra* (evidence not corroborative where Commonwealth's only witness, who identified perpetrator, recanted; limited evidence connecting defendant to crime made recantation of such nature different verdict likely at retrial). Moreover, if the jury were privy to the evidence of Detective Worrell's misconduct in coercing confessions,[34] in light of his involvement in obtaining

_____

[34] In the joint stipulations of fact in the *Veasy* case it is stated that Veasy's counsel obtained witness declarations and homicide investigative files in at least three other cases involving alleged misconduct by Detective Worrell—all occurring prior to Veasy's conviction. Therefore, it is likely that incidents of police misconduct occurring before Carter's conviction may yet come to light

*(Footnote Continued Next Page)*

the statement of the only eyewitness to the crime, and considering Crum's recantation testimony, it would likely compel a non-first-degree-murder verdict. ***Bonaccurso***, ***supra***.

Order reversed. Case remanded for new trial. Jurisdiction relinquished.[35]

Judgment Entered.

Benjamin D. Kohler, Esq.
Prothonotary

Date: 4/24/2025

_____

due to the ever-vigilant work of the City of Philadelphia Conviction Integrity Unit as well as "recent behavioral science research relating to memory, questioning tactics, and compliance" with regard to witness investigations and interrogations. Joint Stipulation of Fact in ***Commonwealth v. Veasy***, CP-51-CR-641521-1992, at 8-12.

[35] Due to the disposition of Carter's first issue, his remaining issues are moot. We do note, however, that the Commonwealth "concede[s] that the information about Detective Worrell should have been revealed during the pendency of [Carter's] original appeal [in 1990-1991]," when the pattern and practice of Worrell's misconduct had come to light in other cases. Appellee's Brief, at 27.